## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ADRIAN CALISTE and BRIAN
GISCLAIR, individually and on behalf of all
others similarly situated,

      Plaintiffs,

v.

HARRY E. CANTRELL, Magistrate Judge
of Orleans Parish Criminal District Court,

      Defendant.

Case No.
Complaint-Class Action

## CLASS ACTION COMPLAINT

1.     Defendant Magistrate Judge Cantrell is responsible for setting bail for persons arrested in Orleans Parish. Defendant Cantrell consistently and unlawfully imposes secured financial conditions of release in an amount that arrestees cannot afford without any inquiry into or findings concerning the arrestee's ability to pay.  He routinely states that he will not consider imposition of non-financial alternative conditions of release.  As a result, the money-based orders of post-arrest release that he imposes constitute de facto orders of pretrial detention for those unable to pay — orders that are issued without the legal and factual findings and procedures required for a valid order of pretrial detention.

2.     Moreover, Defendant Cantrell has an institutional financial conflict of interest in every secured money bond that he imposes because he acts both as a supposedly neutral judicial officer and as an executive responsible for managing the funds generated by each bail order that he sets.  Louisiana law provides that if (and only if) an arrestee uses a commercial surety, the

judges of the Orleans Parish Criminal District Court receive 1.8% of the amount of that bond into the court's General Fund, which Defendant Cantrell and the other judges control. As a result Defendant Cantrell refuses to allow arrestees to post cash bail. He instead requires that financial conditions be paid through a for-profit bail bond ("a commercial surety"), and routinely in amounts larger than $2,500.

3.    These policies and practices result in imminent and ongoing violations of fundamental rights. Plaintiffs, on behalf of themselves and a class of similarly situated arrestees, seek a declaration that Defendant Cantrell's conduct violates the Fourteenth Amendment to the United States Constitution.

**Jurisdiction and Venue**

4.    This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201–02, and the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

5.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

**Parties**

6.    Named Plaintiff Adrian Caliste is a 55-year-old man currently in the custody of the Orleans Parish Sheriff's Office. On June 20, 2017, Mr. Caliste appeared before Defendant Cantrell in the Magistrate section of Orleans Parish Criminal District Court. Defendant Cantrell imposed a secured bond Mr. Caliste cannot afford to pay as a condition of release. He remains in custody solely because he cannot afford to pay the amount of money required for his release. Mr. Caliste represents himself as an individual and a Class of similarly situated people who are all subject to the Defendant's post-arrest money-based detention scheme.

7.      Named Plaintiff Brian Gisclair is a 33-year-old man currently in the custody of the Orleans Parish Sheriff's Office. On June 20, 2017, Mr. Gisclair appeared before Defendant Cantrell in the Magistrate section of Orleans Parish Criminal District Court. Defendant Magistrate Cantrell imposed upon Mr. Gisclair a secured bond he cannot afford to pay as a condition of his release. He remains in custody solely because he cannot afford to pay the amount of money required for his release. Mr. Gisclair represents himself as an individual and a Class of similarly situated people who are all subject to the Defendant's post-arrest money-based detention scheme.

8.      Defendant Harry E. Cantrell is the elected Magistrate Judge for Orleans Parish Criminal District Court. Defendant Cantrell has statutory responsibility for setting bail and determining the conditions of release for pretrial arrestees in Orleans Parish. Defendant Cantrell sets bail upon arrest, prior to the issuance of an indictment, prior to the acceptance of charges by the Orleans Parish District Attorney, and before a criminal proceeding is assigned to a particular section of the Criminal District Court.  He is responsible for determining and modifying conditions of release on an ongoing basis until a case is assigned to a Section of the Criminal District Court. In concert with his fellow judges of the Criminal District Court, Defendant Cantrell acts in an executive capacity to control the expenditures of the Criminal District Court's funds. Defendant Cantrell is sued in his individual capacity and in his official capacity as the presiding Magistrate Judge for the Criminal District Court.

## Facts

A. *Plaintiffs' Continuing Detention Under Orders of Defendant Cantrell.*

**Adrian Caliste**

9.     Plaintiff Adrian Caliste is a retired laborer who has lived his entire life in New Orleans. Most of his family, including his elderly father, siblings, children, and grandchildren live in New Orleans.

10.     Mr. Caliste's primary source of income is his monthly Social Security retirement benefit.

11.     Mr. Caliste spends several days a week as a caretaker for his 92-year-old father.

12.     Mr. Caliste was arrested on June 19, 2017, on allegations of possession of drugs, possession of drug paraphernalia, and traffic violations.

13.     On June 20, 2017, Mr. Caliste appeared in the Magistrate Section of the Orleans Parish Criminal District Court.

14.     Defendant Cantrell asked Mr. Caliste if he could afford a lawyer. When Mr. Caliste said that he could not, Cantrell appointed the office of the Orleans Public Defender to represent Mr. Caliste.

15.     Magistrate Cantrell made no further inquiry into Mr. Caliste's ability to afford any particular amount of secured bail or whether non-financial conditions of release would be appropriate before imposing a total $5,000 secured bail upon Mr. Caliste. On two misdemeanor charges, Defendant Cantrell set Mr. Caliste's bail at $2,500 per charged offense.

16.     Mr. Caliste's public defender argued for Mr. Caliste to be released on his own recognizance, but Magistrate Cantrell imposed a secured money bail.

17.     Mr. Caliste can afford neither the $5,000 bail nor the 12–13% of that total that a bail bondsman would charge to act as a surety. As a result, he waits in jail until he receives his next retirement benefit, which he hopes his family will use to pay a for-profit bonding company.

18.     Mr. Caliste remains in the custody of the Orleans Parish Sheriff's Office.

19.     Neither Magistrate Cantrell nor any judge of the Orleans Parish Criminal District court has made a finding that Mr. Caliste poses either a substantial risk of flight or an imminent danger to the community.

**Brian Gisclair**

20.     Plaintiff Brian Gisclair is a father of three who was laid off from his full-time job about four months ago. Since that time, he has been working sporadically for temporary staffing agencies.

21.     Mr. Gisclair is a resident of Westwego, Louisiana, where he has lived for all of his life. He shares custody of his three children.

22.     Mr. Gisclair was arrested on June 19, 2017, on a single nonviolent misdemeanor charge of possession of drugs.

23.     On June 20, 2017, Mr. Gisclair appeared before Magistrate Cantrell, who appointed the Orleans Public Defender to represent Mr. Gisclair because of his indigence.

24.     Mr. Gisclair's public defender argued that he should be released on his own recognizance, but Magistrate Cantrell instead imposed a $2,500 bail.

25.      Magistrate Cantrell ordered this $2,500 secured money bail without inquiry into Mr. Gisclair's ability to afford this amount of bail.

26.     Magistrate Cantrell did not make any inquiry into whether non-financial conditions of release would be suitable to ensure Mr. Gisclair's return to court.

27.    Mr. Gisclair cannot afford to pay his $2,500 bail, nor can he afford the 12–13% fee a commercial surety would charge him.

28.    As a result of his incarceration, Mr. Gisclair has already missed a previously scheduled job interview.

29.    Mr. Giclair remains in the custody of the Orleans Parish Sheriff's Office

30.    Neither Magistrate Cantrell nor any judge of the Orleans Parish Criminal District court has made a finding that Mr. Gisclair poses either a substantial risk of flight or an imminent danger to the community.

B. *Defendant Cantrell's Practice of Imposing Secured Financial Conditions of Release Without Conducting Any Inquiry into Ability to Pay or Consideration of Non-financial Alternatives.*

31.    Defendant Cantrell regularly sets a $2,500 minimum secured money bond irrespective of the particular facts in the case before him, and without regard to the circumstances surrounding the arrestee appearing before him.  He routinely refuses to entertain arguments for a lower financial condition of release and informs regularly appearing defense lawyers not to even make them. Defendant Cantrell frequently informs defense attorneys that these bail settings "are not an adversarial hearing."

32.    Defense counsel seeking alternative non-financial conditions of release or monetary bonds in amounts lower than $2,500 have been advised explicitly that Defendant Cantrell does not set financial conditions of release below $2,500:

```
20   regular basis.  All the risk questions in this case are
21   negative, which I think is very important in this case.  Your
22   Honor, finally, in the allegations if you go on the gist, the
23   alleged victim at some point tells the police that Ms. Johnson
24   actually didn't strike her, so I think there are a lot of issues
25   in this case, Judge.  I would ask that Your Honor just find
26   probable cause for simple battery and set a bond of $1,000.00
27   because it's a misdemeanor.
28       THE COURT:
29           We don't go any lower than $2,500 in this Court.
30   Okay, State, do you have a response?
```

Tr. of Hr'g at 3:29, *State v. Mishana Johnson*, No. M-559675 (Orleans Parish Crim. Dist. Ct.  Dec. 27, 2016).

33.     In another recent case, an arrestee was accused of "negligent injuring" in the cleaning of his gun. All involved parties agreed that the injuring was an accident. The accused was a chef at a local university, responsible for supporting his fiancé and ten-year-old daughter. The defense sought a monetary bond of $500. Defendant Cantrell stated,

```
19   THE COURT:
20           First of all, this Court never goes any lower
21   than $2,500; okay.  So you'll know that for reference.
22   You don't have to ask me for that anymore.
```

Defendant Cantrell then imposed a secured money bond in the amount of $15,000.  Tr. of Hr'g at 3:19–29, *State v. Jermaine Thomas*, No. M-559871 (Orleans Parish Crim. Dist. Ct.  Jan. 5, 2017).

34.     And in the case of a woman accused of theft,

```
11  |  THE COURT:
12  |          I don't go any lower than $2,500 on my bonds.
```

Tr. of Hr'g at 3:11–13, *State v. Chinette Armstead*, No. M-559278, (Orleans Parish Crim. Dist. Ct. Dec. 19, 2016).

35.     Defendant Cantrell refuses to consider defense arguments on bail amounts, in flagrant violation of the Due Process Clause:

```
2   |      MS. STUDER:
3   |          Your Honor, you set the bond before I was allowed to
4   |  give any information regarding the bond.
5   |      THE COURT:
6   |          Go ahead.
7   |      MS. STUDER:
8   |          Will you take that information into consideration in
9   |  lowering the bond.
10  |      THE COURT:
11  |          I'm going to leave the bond at $2,500.00.
12  |      MS. STUDER:
13  |          No matter what I say?
14  |      THE COURT:
15  |          Yes.
16  |      MS. STUDER:
17  |          Note my objection, Your Honor.
```

Tr. of Hr'g at 4:2–17, *State v. Angie Williams*, No. M-561958 (Orleans Parish Crim. Dist. Ct. March 20, 2017).

36.     In one recent case of a deaf and mute woman with no prior criminal history charged with solicitation of prostitution and believed by Judge Cantrell to be homeless, Defendant Cantrell

8

again confirmed that he would set the bond at $2,500 *regardless of any evidence presented by defense counsel*:

```
1              Is she local?
2         MR. HENN:
3              Homeless.
4         THE COURT:
5              All right.  I'm going to set her bond at $2500.
6         MR. BARNES:
7              Your Honor, would you like to have any mitigating
8    information about her?
9         THE COURT:
10             Pardon?
11        MR. BARNES:
12             Would you like to have any mitigating information for you
13   set the bond?
14        THE COURT:
15             You can give me some information but I'm going to set her
16   bond at $2,500.
17        MR. BARNES:
18             Okay.  So the bond will be set at $2,500 regardless of the
19   information given?
20        THE COURT:
21             Yes.
```

Tr. of Hr'g at 3:1–21, *State v. Lakiesha Myles*, No. M-561626 (Orleans Parish Crim. Dist. Ct. March 9, 2017).

37.    Despite being told that the court would refuse to consider the evidence, the woman's public defender insisted on putting information forward to dispute the facts alleged by police and to show that the accused had, in fact, lived in New Orleans with her mother and three

children for seven years. True to his word, Defendant Cantrell refused to consider those circumstances before requiring a secured monetary amount that she could not afford.

7      MR. BARNES:

8           Your Honor, Kenneth Barnes here on behalf of Ms. Lakiesha
9      Myles.  I will draw the Court's attention again that Ms. Lakiesha
10     Myles is deaf and mute.  She's unable to communicate unless a person
11     is able to sign language.  For that reason I call high scrutiny to
12     this gist that claims that she offers some type of sex act for an
13     amount of money to a person who never in one way states that they
14     did sign language, nor do they state that they know sign language
15     or that she's able to speak.  We can see here today that she's unable
16     to speak, so to believe that she's communicated some type of sex act
17     with someone is hard to believe.  I call that into question as to
18     why you should scrutinize the gist for what it states.  Also, it was
19     stated earlier by the State that Ms. Myles was homeless.  While
20     speaking with the interpreter, the interpreter informed me that Ms.
21     Myles has stated that she is not homeless.  She stays at her mother's
22     home with her three kids and she's been there for approximately
23     seven(7) years.  Ms. Myles is not homeless.  She lives with her kids,
24     she takes care of her kids.  It's hard to believe that she's been
25     able to try to solicit herself for some type of sexual act.  Actually,
26     when she was arrested she was hanging out at her friend's house.  If
27     I remember correctly, it states that she was in the car with the
28     officer but she was at her friend's house when it happened.

29     THE COURT:

```
1            All right.  I've already set the bond at $2,500.  I think
2    we've already communicated that to her.
3        MR. BARNES:
4            Please note my objection for remaining the bond and not
5    taking into consideration the mitigating circumstances.
```

*Id*. at 4:7–29, 5:1–5.

C. *Defendant Cantrell's Policy of Refusing to Consider Non-financial Conditions of Release.*

38.     Defendant Cantrell often arbitrarily refuses to consider Releases on Recognizance ("ROR") or release on other non-financial conditions of release. In another recent case, he declared a person ineligible for consideration for ROR (contrary to state and federal law), asserting that the man was involved in a domestic dispute, despite there being no evidence for that claim. Tr. of Hr'g at 2:11–13, 4:12–16, *State v. Eddie Green*, No. M-561572, (Orleans Parish Crim. Dist. Ct. March 6, 2017).

39.     Not only does Defendant Cantrell refuse to consider non-financial alternatives for those unable to pay and refuse to set lower financial conditions for those who cannot afford $2,500, but Defendant Cantrell also threatens to hold defense counsel in contempt of court for advocating for non-financial conditions or a lower money bond amount.  Defense counsel is placed in the impossible position of having to weigh her own personal freedom against her obligation to advocate for her client's constitutional right to a meaningful bail hearing.  The threat of jail time in retaliation for an attorney's basic oral advocacy would have a chilling effect on even the most zealous advocate and constitutes a gross abuse of authority.

6    eligible - you can ROR him on a simple battery, Your Honor.  I
7    think this is a gentleman for whom this is extremely
8    appropriate, given the issues in the case, his strong work
9    history, that he's a junior in college and I would ask Your
10   Honor for an ROR or in the alternative a bond of $1,000.
11        THE COURT:
12             What did I just tell you about $1,000?
13        MR. MOROZ:
14             Your Honor, I don't think -
15        THE COURT:
16             Did you listen to the Court?  Are you listening?
17        MR. MOROZ:
18             Your Honor, I would object -
19        THE COURT:
20             Don't ask me again for a $1,000.00, please.
21        MR. MOROZ:
22             I would object to that, Your Honor.
23        THE COURT:
24             You can object.
25        MR. MOROZ:
26             I'd object under the Louisiana Right to Bail.
27        THE COURT:
28             Okay.  You can object.
29        MR. MOROZ:
30             Yes, sir.
31        THE COURT:

```
1          I'm giving you a warning.  If it happens again, you
2    subject yourself to a contempt of court.
3       MR. MOROZ:
4          Your Honor, I would notice my intent to seek a writ as
5    to that.
6       THE COURT:
7          I'm giving you a warning.   Okay, we'll set the bond
8    at $5,000.  I'm issuing a Stay Away order.  He can't have any
9    further contact with the victim.  Do you understand me, sir?
```

Tr. of Hr'g at 4–5, *State v. Gavin P. Morgan*, No. M-559682 (Orleans Parish Crim. Dist. Ct. Dec. 27, 2016).

40.     On June 20, 2017, Magistrate Cantrell threatened a defense lawyer with contempt in response to his advocacy for a client to be released on recognizance. In addition to threatening the attorney with contempt, Magistrate Cantrell went so far as to threaten to revoke a release on recognizance that he'd granted to another of that attorney's clients earlier in the day.

D. *Defendant Cantrell's Institutional Financial Interest to Require High Dollar Commercial Surety Bonds.*

41.     The judges of the Orleans Parish Criminal District Court depend on approximately $1 million per year from the fees assessed on for-profit surety bonds that they impose.

42.     In Orleans Parish, the Sheriff collects a $3.00 fee on every $100.00 of liability underwritten by a commercial surety (bond company). La. R.S. § 22:822(A)(2).

43.     Of the $3.00 fee collected on every $100.00 of liability underwritten by a commercial surety,

        i.   $1.00 is allocated directly to Orleans Parish Criminal District Court to be managed by the judges.

     ii.  $2.00 is divided as follows:

       1.  40% to Orleans Parish Criminal District Court Judicial Expense Fund;

       2.  20% to Orleans Parish Sheriff's Office;

       3.  20% to Orleans Parish District Attorney;

       4.  20% to Orleans Parish Office of the Indigent Defender.

La. R.S. §§ 22:822(B)(3), 13:1381.5.

44.     No such fee is levied against arrestees who utilize secured personal sureties, post a cash bail, or are released on recognizance or other non-financial conditions of release.

45.     The Orleans Parish Criminal District Court deposits the 1.8% fee it receives from commercial surety bonds into the court's General Fund, from which it pays for the salaries and benefits of court staff, travel for judicial conferences, office supplies, phone service, building maintenance, legal research, and various other day-to-day expenses.

46.     In 2013, an accountant for the Criminal District Court addressed the New Orleans City Council, stating that the revenue from the 1.8% bond fee was "critical" to the Court's ability to meets its monthly payroll expenses.

47.     In recent years, this 1.8% fee on commercial surety bonds has accounted for 20–25% of the court's General Fund, or about one million dollars. Thus, a significant portion of the court's revenue depends upon criminal defendants posting bond through commercial sureties.

48.     In 2015, 97% of those defendants in Criminal District Court who were assessed a financial bail obtained their freedom through a commercial surety. Only 3% paid their full bail in cash.

49.    Spending from the General Fund is controlled by the judges of the court en banc, in which Defendant Cantrell has an equal vote.

50.    The deposit of the 1.8% fee on commercial surety bonds into the General Fund for Orleans Parish Criminal District Court creates a conflict of interest for Magistrate Judge Cantrell.

51.    Defendant Cantrell's office directly benefits from the collection of the 1.8% fee. The infrastructure of his court—from the salary of his staff to the paper in his printer—depends upon the continued generation of money from for-profit commercial surety fees, which are entirely dependent on his judicial decisions.  As an executive who manages these expenditures along with the other judges, Defendant Cantrell's dual executive and judicial roles destroy the judicial neutrality that is a vital component of the American legal system.

E.    *Defendant Cantrell's Policy of Refusing to Accept Secured Money Bail That Does Not Generate Revenue for the Court.*

52.    Defendant Cantrell routinely refuses to set cash bonds. He instead requires individuals to rely upon a commercial surety, thereby ensuring that his court can generate 1.8% of the bail amount in fees that he and the other judges manage as executives.

```
25    MR. VOGEL:

26         Your Honor, I would note regarding bond that

27    Mr. Medel has been living in New Orleans for about five

28    years and has been working construction for the past

29    year-and-a-half.  He is financially responsible for one

30    very sick child.  He has, to my knowledge, no violent

31    prior convictions whatsoever.  I don't think he has any

32    felon convictions at all.  And so I would seek a bond
```

1    of -- your Honor, I would actually seek a cash bond in

2    this matter.

3    THE COURT:

4         All right.  We'll set the bond at $5,000.  The

5    State has requested an order of protection.  He is

6    ordered not to contact the victim personally,

7    electronically, by phone, in writing, through a third

8    party or go within six hundred yards of the victim.

9    He's also ordered not to contact the victim's family

10   personally, by phone, electronically, in writing or

11   through a third party.  Upon his release, he has to

12   report to our domestic violence court.  I have a case

13   manager here that will explain the stay away order to

14   him, have him sign it, and return it to the Court.

15   MR. VOGEL:

16        Your Honor, I would ask that for both Mr.

17   Cartena and Mr. Medel the Court set cash bonds so that

18   they may be able to furnish --

19   THE COURT:

20        I'm going to deny it.  I'm not going to set

21   any cash bonds.

Tr. of Hr'g at 3:1–21, *State v. Jesus Medel,* No. M-561052 (Orleans Parish Crim. Dist. Ct. Feb. 16, 2017) and *State v. Lorenzo Cortrina*, No. M-561047 (Orleans Parish Crim. Distr. Ct. Feb. 16, 2017).[1]

---

[1] A typo in the transcript misidentifies Mr. Lorenzo Cortrina as "Mr. Cartena."

16

See also,

```
11          A court is more than welcome to set a cash
12     bond alternative.  It happens every single day in this
13     court.
14     THE COURT:
15          Not in my court.  I don't do that.  I don't
16     know what court you're talking about.  But I don't do
17     that in my court.  I've never set a cash bond.
```

Tr. of Hr'g at 6:11–17, *State of Louisiana v. Joseph Dunckley*, No. M-559319 (Orleans Parish Crim. Dist. Ct. December 19, 2016).

53.     Defendant Cantrell's policy and practice of refusing to consider ability to pay, refusing to consider non-financial alternatives, imposing de facto orders of detention without the process and legal standards required, refusing to set any secured money bond amount below $2,500, and institutional financial conflict of interest violate the Due Process and Equal Protection clauses of the Fourteenth Amendment to the Constitution.

54.     The named Plaintiffs and the class they represent are all people that Defendant Cantrell has deemed appropriate for immediate release. They would each be released immediately if they were able to pay a for-profit surety the amount of money required by Defendant Cantrell.

55.     At no point does Defendant Cantrell conduct any proceedings concerning whether a person has the ability to pay the amount of money that he requires.  Nor does he make any inquiry into or findings concerning whether there is any other non-financial condition or combination of conditions that could reasonably assure an arrestee's appearance of the safety of the community. Nor does he conduct any of the proceedings required for a valid order of pretrial detention,

including an adversarial hearing at which findings concerning a person's danger to the community or risk of flight are made pursuant to clearly defined legal standards required by federal law.

56.     Under Defendant Cantrell's money-based practices, those arrestees wealthy enough to pay are released almost immediately after Defendant Cantrell sets their bail.  Some poorer arrestees eventually make arrangements with private bail bond companies, after spending days or weeks in jail.  And many others, who are too poor to come up with enough money, are left to languish in jail until the resolution of their case.

F.    *Defendant Cantrell's Bail Practices as an Ineffective Means of Ensuring Public Safety or Criminal Defendants' Appearance at Trial.*

57.     The empirical evidence shows that there is no relationship between requiring secured money bail as a condition of release and defendants' rates of appearance in court.

58.     Other jurisdictions, including the City of New Orleans Municipal Court, employ non-monetary conditions of release, including unsecured or "signature" bonds, stay-away orders, curfews, or home detention.

59.     Other courts also employ less restrictive methods of maximizing public safety and court appearances when necessary to guard against a particular risk, including unsecured bond, reporting obligations, phone and text message reminders of court dates, rides to court for those without transportation or a stable address, counseling, drug and alcohol treatment, batterer intervention programs, anger management courses, alcohol monitors, or, in extreme cases of particular risk, electronic monitoring, among other services.

60.     Defendant Cantrell is permitted by state law to use these alternatives but, as a matter of routine, chooses not to consider them for impoverished arrestees.

61.     Defendant Cantrell's policies have ramifications for the entire Orleans community and criminal justice system.

62.    Pretrial detention causes unnecessary lost employment, lost housing and shelter, and creates instability in care for dependent children and parents.  It also unnecessarily subjects detained individuals to violent conditions in the Orleans jail, causing harm to arrestees' physical and mental health. This increases community costs and make a person less stable and healthy upon their ultimate release.

63.    Individuals who are detained pretrial — instead of released on money bail or on a personal bond — have worse case outcomes in every measurable way, even when controlling for all other factors.[2]

64.    Setting a secured money bail without an inquiry into ability to pay and in an amount higher than a person can afford by definition defeats the purpose of money bail — to incentivize a person to return to court — and removes any legitimate (let alone compelling) state interest in the setting of a financial condition.  Nor is setting money bail without findings concerning ability to

---

[2] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 18 (May 2, 2016), available at https://www.law.upenn.edu/cf/faculty/research/details.cfm?research_id=14047; Arpit Gupta, et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization* 45 J. Legal Stud. 471, 472, 487 (2016) (finding a 12 percent increase in the likelihood of conviction when money bail is imposed); Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stanford L. Rev. 711 (2017) (finding that misdemeanor pretrial defendants detained in Harris County, Texas, were 25% more likely to plead guilty, 43% more likely to be sentenced to jail, and had sentences more than twice as long as those defendants who were released pretrial); Lise Olson, *Study: Inmates Who Can't Afford Bond Face Tougher Sentences* Houston Chron., Sept. 15, 2013, available at http://news.houstonchronicle.com/news/houston-texas/houston/article/Study-Inmates-who-can-t-afford-bond-face-tougher-4817053.php (discussing Carlos Mathis, an African-American man, who was held in jail for seven months on minor drug and theft charges because he could not afford money bail, and whose charges were dismissed); Isami Arifuku & Judy Wallen, *Racial Disparities at Pretrial and Sentencing and the Effects of Pretrial Services Programs* (Mar. 11, 2013), available at http://www.pretrial.org/download/research/Racial%20Disparities%20at%20Pretrial%20and%20Sentencing%20and%20the%20Effects%20of%20Pretrial%20Services%20Programs%20-%20NCCD%202013.pdf; Cynthia E. Jones, *"Give Us Free": Addressing Racial Disparities in Bail Determinations*, 16 N.Y.U. Legis. & Pub. Pol'y 919 (2013); Tina L. Freiburger, et al., *The Impact of Race on the Pretrial Decision*, American Journal of Criminal Justice (2010), available at http://libres.uncg.edu/ir/asu/f/Marcum_CD_2010_Impact_of_Race.pdf; *The Hidden Costs of Pretrial Detention* at 3, 19 (Nov. 2013), available at http://www.pretrial.org/download/research/The%20Hidden%20Costs%20of%20Pretrial%20Detention%20-%20LJAF%202013.pdf (studying 153,407 defendants and finding that "when held 2–3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* 5 (2013), *available at*: http://www.arnoldfoundation.org/sites/default/files/pdf/LJAF-Pretrial-CJ-Research-brief_FNL.pdf (finding that "low-risk defendants held 2–3 days were 17 percent more likely to commit another crime within two years" and that those detained "4–7 days yielded a 35 percent increase in re-offense rates.").

pay the most narrowly tailored way to meet any other legitimate or compelling government interest.

## Class Action Allegations

65.    The named Plaintiffs brings this action, on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

66.    A class action is a superior means, and the only practicable means, by which the named Plaintiffs and unknown Class members can challenge the Defendant's unlawful post-arrest detention scheme.

67.    This action is brought and may properly be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

68.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

69.    The Plaintiffs propose the following class seeking declaratory relief only:

> all presumptively innocent arrestees who are now before or who will come before Defendant for proceedings concerning pretrial release or detention and who are unable to pay the financial condition that Defendant Cantrell imposes as a requirement for their immediate release.

**A.    Numerosity.  Fed. R. Civ. P. 23(a)(1).**

70.    Each arrestee is presented with the Defendant's standard money-bond options of pay or jail.  Arrestees are held in jail for varying lengths of time depending on how long it takes them to make the payment that the Defendant requires for their release, or to obtain a commercial surety.

71.    The number of current and future arrestees subjected to these policies is innumerable.  Over thirty thousand individuals are arrested in Orleans Parish annually. Defendant Cantrell establishes post-arrest but pre-indictment release conditions for a large portion of those arrestees. Including future arrestees, the proposed Class contains thousands of people.

**B.    Commonality.  Fed. R. Civ. P. 23(a)(2).**

72.    The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.  The named Plaintiffs seeks relief concerning a determination as to whether the Defendant's policies, practices, and procedures violate the rights of the Class members.

73.    These common legal and factual questions arise from one central scheme and set of policies and practices:  the Defendant's post-arrest detention scheme and the procedures (or lack thereof) that he follows when imposing financial conditions of release.  The Defendant operates this scheme openly and in materially the same manner every day.  The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

Among the most important, but not the only, common questions of fact are:

- Whether Defendant has a policy and practice of refusing to conduct an inquiry into ability to pay prior to requiring secured financial conditions of release;
- Whether Defendant has a policy and practice of refusing to consider ability to pay prior to requiring secured financial conditions of release;
- Whether Defendant has a policy and practice of routinely refusing to consider non-financial conditions of release in many cases;
- Whether Defendant requires secured financial conditions of release without making any findings that those conditions are the least restrictive condition necessary to mitigate any particular risks identified;
- Whether Defendant has a policy and practice of regularly imposing secured financial conditions of release arbitrarily in amounts of $2,500 and above;
- Whether Defendant has a policy and practice of refusing to allow posting of cash

bonds, thereby requiring utilization of a commercial surety company;

- Whether Defendant Cantrell and the other judges of the Orleans Parish Criminal District Court exercise control over the expenditure of funds generated through the 1.8% fee on commercial surety bonds set by Cantrell;
- Whether the funds generated from the fee on commercial surety bonds are used by Defendant Cantrell and his fellow judges to fund the operations of the Orleans Parish Criminal District Court.

74. Among the most important common question of law are:

- Whether requiring a financial condition of pretrial release without inquiry into and findings concerning a person's ability to pay, and without consideration of alternative non-financial conditions of release, violates the Fourteenth Amendment's Due Process and Equal Protection Clauses;
- Whether Defendant's institutional financial conflict of interest in the imposition of secured financial conditions of release violates the Fourteenth Amendment's Due Process Clause.

**C.     Typicality.  Fed. R. Civ. P. 23(a)(3).**

75.     The named Plaintiffs' claims are typical of the claims of the other members of the Class, and they have the same interests in this case as all other members of the Class that they represent.  Each of them suffers injuries from the failure of the Defendant to comply with the basic constitutional provisions:  they are each confined in jail because they could not afford to pay the Defendant's required bond amount.  The answer to whether the Defendant's scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

76.     If the named Plaintiffs succeed in the claim that the Defendant's policies and practices concerning post-arrest detention violate their constitutional rights, that ruling will likewise benefit every other member of the Class.

**D.     Adequacy.  Fed. R. Civ. P. 23(a)(4).**

77.     The named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests

of the other Class members, who each have the same basic constitutional claims. They are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class members.

78.     There are no known conflicts of interest among members of the proposed Class, all of whom have a similar interest in vindicating their constitutional rights in the face of their unlawful treatment by their local government.

79.     Plaintiffs are represented by attorneys from the Roderick and Solange MacArthur Justice Center in New Orleans ("MacArthur Justice Center")[3] and Civil Rights Corps[4] who have experience in litigating complex civil rights matters in federal court and knowledge of both the details of the Defendant's scheme and the relevant constitutional and statutory law.

80.     The efforts of Class counsel have so far included investigation of Defendant's money-based pretrial detention system, interviews of jail inmates and attorneys practicing in the area, consultation with local and national experts, and research regarding the legality of Defendant's secured money-bail regime.

81.     Class counsel have studied the way that post-arrest detention systems function in other cities and counties in order to investigate the wide array of lawful options in practice for municipal entities.

---

[3] The MacArthur Justice Center is a non-profit public interest law firm. Undersigned counsel Katie Schwartzmann, the co-Director of the MacArthur Justice Center, has practiced law in Louisiana for twelve years and has litigated a wide variety of complex civil matters in state and federal court. She is presently class counsel for thousands of prisoners in the Orleans Parish Prison. Undersigned counsel Eric Foley, staff attorney at the MacArthur Justice Center, worked for two years as a federal judicial clerk in the District Court of Puerto Rico before beginning his practice of law in Louisiana in 2011. He has litigated civil rights cases at the trial and appellate stages in state court.
[4] Civil Rights Corps is a non-profit civil rights organization based in Washington, D.C. Counsel from Civil Rights Corps has been counsel in nearly twenty similar federal civil rights class action lawsuits.

82.    Class counsel also have experience litigating similar challenges in other jurisdictions and years of experience litigating complex and important cases in Louisiana federal courts.

83.    As a result, counsel have undertaken significant efforts toward becoming intimately familiar with the Defendant's scheme and with all of the relevant state and federal laws and procedures than can and should govern it.  The interests of the members of the Class will be fairly and adequately protected by the named Plaintiffs and their attorneys.

**E.    Rule 23(b)(2).**

84.    Class action status is appropriate because the Defendant, through the policies, practices, and procedures that make up his post-arrest money-based release and detention scheme, acts in the same unconstitutional manner with respect to all class members.  Defendant has created and applied a scheme of post-arrest detention and release procedures that requires presumptively innocent arrestees to pay a bond of at least $2,500 to a commercial surety to secure their release. Defendant releases those who can pay and detains those who cannot, without considering alternative non-financial conditions of release or conducting the constitutionally required inquiry into ability to pay.  Impoverished arrestees who remain detained eventually have their first appearance before a judge, but it may be months before a case is accepted by the District Attorney and assigned to a Criminal District Court section. Thus, impoverished arrestees are kept illegally in jail for days, weeks, and months as a result of the Defendant's policies, practices, and procedures.  Each further day of wealth-based detention results in irreparable harm.

85.    The Class therefore seeks declaratory relief as to Defendant's policies, practices, and procedures, which are unconstitutional in materially the same way for every class member. Because the putative Class challenges the Defendant's scheme as unconstitutional through

declaratory relief that would apply the same relief to every member of the Class, Rule 23(b)(2) certification is appropriate and necessary.

**Claims for Relief**

**Count One:  Defendant's Policies and Practices Violate Plaintiffs' Rights By Jailing Them Solely Because They Cannot Afford a Money Payment Without an Inquiry Into and Findings Concerning Their Ability to Pay or Consideration of Non-Financial Alternative Conditions of Release.**

86.    Plaintiffs incorporate by reference the allegations in paragraphs 1–85.

87.    The Fourteenth Amendment's Due Process and Equal Protection Clauses have long prohibited keeping a person in jail solely because of the person's inability to make a monetary payment.  Defendant violates Plaintiffs' fundamental rights by keeping them in jail after arrest when they cannot afford to pay the amount of money set by the Defendant without an inquiry into and findings concerning their ability to pay and without consideration of alternative non-financial conditions of release.

**Count Two:  Defendant's Institutional Financial Conflict of Interest in the Imposition of Secured Financial Conditions of Release Violates Due Process**

88.    The Due Process Clause ensures the fundamental neutrality of American judicial proceedings.  Defendant Cantrell's dual role as a judge determining conditions of pretrial release and as an executive in charge of managing the Court's finances creates an institutional conflict of interest that deprives Plaintiffs of their right to a neutral tribunal.  In Defendant Cantrell's courtroom, Defendant imposes these secured financial conditions of release that Defendant and the other judges of the Criminal District Court know will result in their collecting and controlling 1.8% of the bond amount into a fund that they manage.  This creates an intolerable judicial financial conflict of interest and results in a proceeding that lacks the basic neutrality required in American law.

25

**<u>Request for Relief</u>**

WHEREFORE, Plaintiffs and the other Class members request that this Court issue the following relief:

a.  A declaratory judgment that the Defendant violates the named Plaintiffs' and Class members' constitutional rights by promulgating and enforcing policies that result in jailing Plaintiff and Class members and keeping them in jail solely because they are poor and cannot afford to pay an amount of money to secure release.

b.  A declaratory judgment that Defendant Cantrell has a conflict of interest that violates the Due Process rights of defendants appearing before him where he imposes commercial surety bonds as a condition of release, fees on such commercial surety bonds generate substantial revenue for the Orleans Parish Criminal District Court, and Cantrell has executive authority of the fund in which those fees are deposited.

Respectfully submitted,


*/s/ Katie M. Schwartzmann*
Katie M. Schwartzmann, La Bar No. 30295
Eric A. Foley, La Bar No. 34199, T.A.
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, La 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
katie.schwartzmann@macarthurjustice.org
eric.foley@macarthurjustice.org


Alec Karakatsanis, D.C. Bar No. 999294
(Pro Hac Vice Application Pending)
Founder and Executive Director
Civil Rights Corps
910 17th Street NW, Fifth Floor
Washington, DC 20006
(202)-681-2409
alec@civilrightscorps.org