**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ADRIAN CALISTE and BRIAN GISCLAIR, individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>v.<br><br>HARRY E. CANTRELL, Magistrate Judge of Orleans Parish Criminal District Court,<br><br>  Defendant. | Case No. 2:17-cv-06197-EEF-MBN |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

I. Introduction ............................................................................................................. 1

II. Factual and Procedural Summary ........................................................................... 2

III. Standard of Review ................................................................................................. 5

IV. Argument ................................................................................................................ 5

 A. Magistrate Cantrell's Jailing of Plaintiffs on Unattainable Financial Conditions Violates Equal Protection and Due Process. ............................................................................. 5

  1. The Constitution prohibits wealth-based detention and secures a right to pretrial liberty. ...................................................................................................................... 7

   a. Requiring unattainable money bond is a de facto order of detention ....................... 8

   b. Requiring unattainable money bond without making a finding that detention is necessary to serve a compelling government interest is a violation of equal protection and due process ................................................................................................................ 9

  2. Magistrate Cantrell violates these substantive rights by not making any finding that pretrial detention is necessary. .................................................................................... 12

  3. The Constitution requires adequate procedural safeguards when a judicial officer imposes de facto pretrial detention. .............................................................................. 13

a.     The judicial officer must conduct an inquiry into ability to pay and make on-the-record findings concerning ability to pay ........................................................................ 13

b.     The judicial officer must provide additional procedural safeguards to ensure the accuracy of the pretrial detention decision ..................................................................... 14

    i.     The judicial officer must prove by clear and convincing evidence that pretrial detention is necessary to mitigate either a risk of flight or a danger to the community 16

    ii.     Arrestees must be represented by counsel ........................................................ 24

c.     Magistrate Cantrell issues orders of detention without providing the required procedural safeguards ......................................................................................................... 26

B.     Magistrate Cantrell's Reliance Upon the 3% Fee on Commercial Sureties to Fund the Operations of his Court is a Conflict of Interest that Violates the Due Process Clause .......... 27

    1.     Binding precedent dictates that judges' institutional conflicts of interest violate the due process rights of those appearing before them .................................................................... 28

    2.     *Augustus v. Roemer* and the Louisiana Legislature's response to this Court .............. 31

    3.     Magistrate Cantrell's conflict of interest in imposing secured bonds violates the Due Process Clause ........................................................................................................................ 33

V.     Conclusion ................................................................................................................ 34

## I.   Introduction

Magistrate Harry Cantrell routinely conditions the release of arrestees in Orleans Parish on the payment of a secured money bond. He imposes financial conditions of release without inquiry into arrestees' ability to pay or consideration of non-financial alternative conditions of release.  When arrestees cannot afford to pay, they are therefore detained prior to trial without any finding that their detention is necessary to protect the community or to assure the court of their appearance.

As alleged in Count One of the Complaint, these practices violate equal protection, substantive due process, and procedural due process. A financial condition of release imposed without consideration of whether a person can pay it violates equal protection because it detains that person solely because he or she is too poor to pay. And an unattainable bail order is a de facto order of detention—i.e., a denial of bail. It infringes on the substantive due process right to pretrial liberty and must withstand strict scrutiny: Magistrate Cantrell must make a finding on the record that no other condition or combination of release conditions would reasonably assure the court of the defendant's appearance or the public's safety. And, given the fundamental nature of this liberty interest, an order imposing an unattainable money bail must be the product of proceedings that provide sufficient procedural protections to ensure the accuracy of the required substantive findings.

Count Two of the Complaint alleges that Magistrate Cantrell has an unconstitutional bias when he imposes a secured money bond. His court is financially dependent on a fee directly tied to the amount of commercial surety bonds issued in Orleans Parish. Magistrate Cantrell and his fellow judges of the Criminal District Court have executive control over this fee. The inherent

1

temptation to set higher money bond amounts to ensure the continued operation of his court is an unconstitutional conflict of interest under long-standing Supreme Court precedent.

The material facts supporting each of these claims are undisputed, and legal precedent discussed in detail below requires that summary judgment issue in Plaintiffs' favor.

## II.     Factual and Procedural Summary

Defendant Harry Cantrell is the Magistrate of Orleans Parish Criminal District Court. In that capacity, he presides over First Appearance Hearings for those who have been recently arrested. (Statement of Uncontested Material Facts ("SUMF") ¶ 7.) During these hearings, Magistrate Cantrell appoints counsel, determines probable cause for arrest, and determines the conditions of pretrial release. (SUMF ¶ 7.) Magistrate Cantrell regularly requires a secured money bond as a condition of release. (SUMF ¶ 18.) He routinely sets these bonds without any inquiry into a person's ability to pay. Nor does he explain his determination of the secured bond amount or why alternative, non-financial conditions of release would not serve the government's interests. (*Id.* ¶ 19.) Magistrate Cantrell has threatened defense counsel with contempt for making arguments for lower bond for his client. (*Id.* ¶ 15.) He has also informed a public defender that, before hearing any argument, no argument would result in his setting a bond lower than $2,500. (*Id.*) As a result of the above practices, Magistrate Cantrell makes no finding of whether the financial condition of release will actually operate as an order of pretrial detention, and Plaintiffs are therefore not provided the substantive findings and procedural safeguards required for a valid order of pretrial detention. (*Id.* at 19.)

In every year since at least 2012, between 19–26% of the Orleans Parish District Court's Judicial Expense Fund—about one million dollars—has been financed by a percentage fee that is charged on every commercial surety bond posted in Orleans Parish. (*Id.* ¶¶ 31–33, 37.) The fee,

established by La. R.S. § 22:822, guarantees that an amount equal to 1.8% of every commercial surety bond over $100 will be collected from bail bond companies when they post an arrestee's bond. (*Id.* ¶¶ 31–32.)  The fee is deposited into the court's Judicial Expense Fund ("JEF")—also known as the "General Fund." (*Id.* ¶ 33.) The higher the amount of a bond issued by a commercial surety, the higher the revenue to the JEF. While Magistrate Cantrell and his fellow judges no longer receive any personal financial benefit from the fee collected on commercial sureties, the fee is instrumental to the court's operation. The JEF finances salaries and benefits for the judges' staff and other general operating costs for the court. (*Id.* ¶ 35.) The judges, including Magistrate Cantrell, have sole executive control over the fund, which they govern via en banc vote. (*Id.* ¶ 34.) The judges have historically divided the JEF equally amongst themselves in amounts of about $250,000 each year for their staff's salaries and an additional $1,000 per month in office expenses. (*Id.*) Magistrate Cantrell employs five people in his chambers. (*Id.* ¶ 36.) The funds obtained from the fee on commercial sureties is "critical to [the judges] meeting payroll." (*Id.* ¶ 32.)

On June 20, 2017, Plaintiffs Caliste and Gisclair were brought before Magistrate Cantrell for a bail hearing. (*Id.* ¶ 20.) Both men had been arrested the day before for alleged drug possession. (*Id.* ¶¶ 1, 4.) Magistrate Cantrell qualified both men for representation by the public defender. (*Id.* ¶¶ 21–22.) In both men's cases, Magistrate Cantrell asked them only whether they had a lawyer and when they had last worked. (*Id.*) Both men were unemployed at the time. (*Id.*) Mr. Caliste is retired and last worked three years ago. (*Id.* ¶ 21.) Mr. Gisclair informed Magistrate Cantrell that he had last worked seven or eight months prior. (*Id.* ¶ 22.) Magistrate Cantrell asked no further questions of the men concerning their financial status.

After determining probable cause for the arrests, Magistrate Cantrell then imposed a secured bond as conditions of release: $5,000 for Mr. Caliste and $2,500 for Mr. Gisclair. (*Id.* ¶¶ 23–24.) Magistrate Cantrell made no inquiry into whether either man could afford the secured bond he imposed. (*Id.*) He made no findings that either man was a flight risk or a danger such that he should not be released on bail while awaiting trial. (*Id.*) And he therefore made no findings that conditions of release other than secured money bond could not assure the court of Plaintiffs' return or that the resulting pretrial detention was necessary to serve a compelling government interest. (*Id.*) Mr. Caliste could not afford the $5,000 bond imposed by Magistrate Cantrell, and he remained jailed for another two-and-a-half weeks. (*Id.* ¶ 3.) Mr. Gisclair, likewise, could not afford the $2,500 bond that Magistrate Cantrell set, and he remained jailed for over a month. (*Id.* ¶ 6.)

On June 27, 2017, Plaintiffs Caliste and Gisclair filed this class action against Magistrate Cantrell, alleging that his pretrial detention practices violate the Equal Protection and Due Process Clauses and that the 1.8% fee collected on commercial sureties created an unconstitutional conflict of interest for Magistrate Cantrell when he sets bail. Plaintiffs seek only declaratory relief.

Defendant Cantrell first moved for dismissal on July 14, 2017, arguing that Plaintiffs lacked standing, Plaintiffs failed to state a claim for relief, and the Court should decline to hear the case under *Younger* abstention doctrine. (ECF No. 10.) The Court denied the motion to dismiss on August 25, 2017. (ECF No. 44.) Magistrate Cantrell filed a second motion to dismiss on November 7, 2017, arguing that he was not a proper defendant under 42 U.S.C. § 1983. (ECF No. 65). The Court denied this motion on December 12, 2017. (ECF No. 81.) Following a period of limited discovery for class certification purposes, the parties submitted additional briefing on

4

Page 7 of 37

Plaintiffs' Motion to Certify a Class. (ECF Nos. 87; 95; 98.) The Court certified Plaintiffs' claims as a class action on March 16, 2018. (ECF No. 99.)

The class certified by the Court, as defined in Plaintiffs' Complaint and Motion to Certify a Class Action, is as follows: "all presumptively innocent arrestees who are now before or who will come before Defendant for proceedings concerning pretrial release or detention and who are unable to pay the financial condition that Defendant Cantrell imposes as a requirement for their immediate release." (ECF Nos. 1 at 20; 5-1 at 2.)

### III.    Standard of Review

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.,*783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

### IV.    Argument

**A. Magistrate Cantrell's Jailing of Plaintiffs on Unattainable Financial Conditions Violates Equal Protection and Due Process.**

Magistrate Cantrell's practices are unconstitutional on three distinct yet related grounds: equal protection, substantive due process, and procedural due process. First, equal protection and

due process forbid jailing a person solely because of her inability to make a payment. *See Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983); *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978); *Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972) (holding that a requirement to pay a fine or serve time in jail violates equal protection and due process unless it is "necessary to promote a compelling governmental interest" (quotation and citation omitted)).  Second, substantive due process protects a right to pretrial liberty that is "fundamental." *Salerno*, 481 U.S. 739, 750 (1987); *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

Third, the Constitution requires the government to provide procedural safeguards to protect against the erroneous deprivation of substantive rights. *Washington v. Harper*, 494 U.S. 210, 228 (1990). To determine whether those procedural safeguards are adequate, a court must first determine whether a liberty interest has been deprived and then ask whether the procedures accompanying the deprivation were sufficient. *See, e.g.*, *ODonnell v. Harris Cnty.*, 882 F.3d 528, 540 (5th Cir. 2018).

The two substantive constitutional rights at issue—the right against wealth-based detention and the fundamental right to pretrial liberty—cannot be infringed unless the government satisfies strict scrutiny: the government must demonstrate that wealth-based pretrial detention is the least restrictive way for it to serve a compelling interest.  Thus, before requiring a person to make a monetary payment in exchange for release from detention, the government must inquire into and make findings concerning the person's ability to pay.  If the person cannot pay the amount required, such that the condition of release will function as a de facto detention

order, then the government must justify the order in the same way that it justifies a transparent

order of detention.

1.   **The Constitution prohibits wealth-based detention and secures a right to pretrial liberty.**

The Equal Protection and Due Process Clauses protect a substantive right against wealth-

based detention. *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc) ("The

incarceration of those who cannot [pay money bail], without meaningful consideration of other

possible alternatives, infringes on both due process and equal protection requirements."). A

person may not be "subjected to imprisonment solely because of his indigency." *Tate v. Short*,

401 U.S. 395, 397–98 (1971); *see also Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983);

*Williams v. Illinois*, 399 U.S. 235, 241–42 (1970); *Frazier*, 457 F.2d at 728. That principle

applies with greater force in the pretrial context, where the detainee is presumed innocent. *See*

*Pugh*, 572 F.2d at 1056 (holding that the Constitution's prohibition on post-conviction wealth-

based detention has "broader . . .  implications" for those "accused but not convicted of crimes").

Applying *Pugh*, the Fifth Circuit in *ODonnell* again recognized the right against wealth-

based detention, holding that Harris County's post-arrest system—in which "poor arrestees . . .

are incarcerated where similarly situated wealthy arrestees are not, solely because the indigent

cannot afford to pay a secured bond"—violates the Constitution. 882 F.3d at 544.

Pretrial detention of a presumptively innocent person due to her inability to make a

monetary payment implicates a second substantive constitutional right: the "fundamental" right

to pretrial liberty. *Salerno*, 481 U.S. at 750; *see also Zadvydas v. Davis*, 533 U.S. 678, 690

(2001) ("Freedom from imprisonment—from government custody, detention, or other forms of

physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.");

*Foucha*, 504 U.S. at 80; *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (en banc)

7

(applying strict scrutiny to Arizona pretrial detention law because it infringed on the "fundamental" right to pretrial liberty); *Buffin v. San Francisco*, No. 15-CV-04959, 2018 WL 424362 at *6 (N.D. Cal. Jan. 16, 2018) (holding that pretrial detention due to inability to pay "implicates plaintiffs' fundamental right to liberty").

Recent opinions in state courts have also held that the U.S. Constitution protects a fundamental liberty interest in pretrial freedom. *Brangan v. Commonwealth*, 80 N.E.3d 949, 961–63 (Mass. 2017) (recognizing that the right to pretrial liberty is "fundamental"); *In re Humphrey*, 19 Cal. App. 5th 1006, 1049 (Cal. Ct. App. 2018) (recognizing the "fundamental constitutional right to pretrial liberty") (internal quotations and citations omitted).

In an amicus brief before the Fifth Circuit in *ODonnell*, the Conference of Chief Justices, whose membership consists of the highest judicial officer of each state, the District of Columbia, and each United States territory and commonwealth, affirmed this principle, stating that an arrestee "has a protected interest in pretrial liberty." Brief of Conference of Chief Justices as Amicus Curiae, *ODonnell v. Harris Cnty., Tex.*, No. 17-20333, 2017 WL 3536467 at *27 (5th Cir. Aug. 9, 2017).

### a. Requiring unattainable money bond is a de facto order of detention

Every court that has considered the question has recognized that an order requiring a person to pay an unattainable amount of money to secure release is a de facto order of pretrial detention. *ODonnell*, 251 F. Supp. 3d at 1161 (holding that secured money bail set in an amount that an arrestee cannot afford is constitutionally equivalent to an order of detention), *aff'd in part, rev'd on other grounds*, 882 F.3d at 544 (holding that defendants' practices result in the "absolute deprivation of [indigent arrestees'] most basic liberty interest—freedom from incarceration"). The First Circuit and D.C. Circuit Courts of Appeal have also recognized that

8

unattainable conditions of release operate as detention orders. *United States v. Mantecon-Zayas*, 949 F.2d 548, 550 (1st Cir. 1991) ("[O]nce a court finds itself in this situation—insisting on terms in a 'release' order that will cause the defendant to be detained pending trial—it must satisfy the procedural requirements for a valid detention order . . . ."); *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969) ("[T]he setting of bond unreachable because of its amount would be tantamount to setting no conditions at all."). Massachusetts's highest court has similarly held that unattainable money bail "is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty." *Brangan*, 80 N.E.3d at 963.

> **b. Requiring unattainable money bond without making a finding that detention is necessary to serve a compelling government interest is a violation of equal protection and due process**

Because the "interest in liberty" is "fundamental," it is a "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Salerno*, 481 U.S. at 750.  Like other constitutional rights, however, the right to pretrial liberty is not absolute: the government may deprive a person of her right to pretrial liberty if the government's interest is sufficiently compelling and the deprivation is narrowly tailored to serve that interest. *Salerno*, 481 U.S. at 749, 751; *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (holding that the government may not infringe "'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest" (internal quotations omitted)); *Lopez-Valenzuela*, 770 F.3d at 780 (holding that infringement of the fundamental right to pretrial liberty requires strict scrutiny review). A government infringement on pretrial liberty must be the least restrictive

means necessary to reasonably serve the government's interests in court appearance and community safety. *See ODonnell*, 251 F. Supp. 3d at 1156–57.

In the equal protection framework, government action that infringes the right against wealth-based detention must likewise satisfy strict scrutiny.  In *Frazier*, the Fifth Circuit held that strict scrutiny was the appropriate constitutional standard when it invalidated a practice requiring an indigent person to either pay a fine or be jailed after conviction because the alternative jail term was not "necessary to promote a compelling government interest." 457 F.2d at 728 (quotations omitted). *Frazier* explained that there were "far less onerous alternatives" that would satisfy the "state's interest in collecting its fine revenue." *Id.* at 728.

 The Court in *Bearden*, while not labeling the level of scrutiny that it applied, similarly required "careful inquiry" into the state's asserted interests and "the existence of alternative means for effectuating" those interests. 461 U.S. at 666–67; *see also Pugh*, 572 F.2d at 1057 (explaining that the same principles apply prior to trial and that the Constitution requires "meaningful consideration of . . . alternatives" to "incarceration of those who cannot" pay a financial condition of release and a finding that secured money bail "is necessary to reasonably assure defendant's presence at trial"). Accordingly, if the government's interest in "appearance at trial could reasonably be assured by . . . alternate [conditions] of release, pretrial confinement for inability to post money bail" is unconstitutional. *Id.* at 1058; *see also Buffin*, 2018 WL 424362 at *8 ("[A]n examination of the *Bearden-Tate-Williams* line of cases persuades the Court that strict scrutiny applies to plaintiffs' Due Process and Equal Protection claims.")

The Fifth Circuit's interlocutory decision in *ODonnell* held that "heightened scrutiny" applies and that "the district court's application of intermediate scrutiny was not in error."

*ODonnell*, 882 F.3d at 544.[1] The district court applied intermediate scrutiny, however, in a preliminary injunction context in which the plaintiffs bore the burden of demonstrating a likelihood of success on the merits. *ODonnell*, 251 F. Supp. 3d 1052, 1138 (S.D. Tex. 2017). The district court noted that it was applying the more deferential standard of intermediate scrutiny and, even under a standard more deferential to the government, found it likely that Plaintiffs would succeed on the merits. *Id.* The ultimate question of whether strict or intermediate scrutiny is the correct standard in a final adjudication of these claims was not addressed by the district court or the Fifth Circuit. The Fifth Circuit's statement that the use of intermediate scrutiny "was not in error"—when read in context—approves of heightened scrutiny and rejects the defendants' arguments for rational basis review. 882 F.3d at 543–44 ("[The County] argues: . . . . (2) rational basis review applies and is satisfied. . . . . Heightened scrutiny of the County's policy is appropriate."). Furthermore, in light of binding precedent, *see Frazier*, 457 F.2d at 728, the Fifth Circuit's *ODonnell* decision should be read as having applied strict scrutiny.

　　Thus, an unattainable money bail order triggers both the strict scrutiny required by the *Bearden-Frazier-Pugh* wealth-based detention cases and the strict scrutiny required for the deprivation of pretrial liberty under *Salerno.* According to both lines of precedent, because a person may not be jailed unless there are no less-restrictive alternatives that are adequate to meet

---

[1] "Heightened" scrutiny may be either strict or intermediate. *See, e.g.*, *Lauder, Inc. v. City of Houston, Tex.*, 751 F. Supp. 2d 920, 933 (S.D. Tex. 2010). Both require the government to show that infringing a private right is narrowly tailored to a compelling interest. *Id.* If strict scrutiny applies, the policy must be necessary to achieve a compelling interest. *Id.* If intermediate scrutiny applies, then the action is constitutional if it serves "a substantial government interest that would be achieved less effectively absent the regulation." *Id*; *see also ODonnell*, 251 F. Supp. 3d at 1138–39.

　　*Pugh* does not address whether strict or intermediate scrutiny applies in the context of wealth-based detention. 572 F.2d 1053. But *Frazier*, which remains binding, explicitly applied strict scrutiny, 457 F.2d at 728, consistent with *Bearden*'s later rejection of a challenged practice because the government's interest could "often be served by alternative means," 461 U.S. at 671–72. In any event, this Court need not resolve what scrutiny applies because the challenged practices do not withstand intermediate scrutiny and because strict scrutiny unquestionably applies to the substantive due process claim.

a compelling government interest, the government may not detain an arrestee prior to trial unless it determines that the detention is necessary.

### 2. Magistrate Cantrell violates these substantive rights by not making any finding that pretrial detention is necessary.

Magistrate Cantrell's failure to inquire into and consider the Plaintiff class's ability to pay the secured money bonds that he sets violates equal protection and due process. All else being equal, a wealthy person and a poor person arrested for the same crime and brought before Magistrate Cantrell for a first appearance have drastically different fates. The poor person would remain incarcerated prior to trial for no other reason than her poverty, while the wealthy person could pay for her freedom. This disregard for an arrestee's ability to afford a secured bond is indicative of Magistrate Cantrell's customary practice and is exactly the conduct that the Fifth Circuit first decried in *Pugh* and condemned most recently in *ODonnell*.

Magistrate Cantrell's de facto orders of pretrial detention for those who cannot pay for their release—like Plaintiffs Caliste and Gisclair, who spent weeks behind bars because they could not afford bond—are not narrowly tailored to a compelling interest. Instead, the amounts of these secured bonds are imposed without any consideration of whether a less restrictive alternative would achieve the government's interests. Apart from hearing "not a lot of information" from the public defenders—usually only a defendant's employment status and whether she has dependents—Magistrate Cantrell "[doesn't] ask many questions after that, if any." (SUMF ¶ 13.) Magistrate Cantrell does not make the constitutionally required finding that pretrial detention is necessary before entering de facto orders of pretrial detention. (SUMF ¶ 19.) The effect is to discriminate against people on the basis of their poverty and to deprive them of a fundamental liberty interest.

> ### 3.  The Constitution requires adequate procedural safeguards when a judicial officer imposes de facto pretrial detention.

Analysis of procedural due process issues "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Plaintiffs satisfy the first step because, as explained above, Plaintiffs have been deprived of two substantive liberty interests: the right against wealth-based detention and the fundamental interest in pretrial liberty. *See Salerno*, 481 U.S. at 750.

The second step of the procedural due process analysis—determining the procedures required for a valid pretrial detention order—proceeds under the *Mathews v. Eldridge* three-part balancing test, in which a court must consider, for each procedure, (1) "the private interest" at issue, (2) "the risk of an erroneous deprivation" absent the sought-after procedural protection, and (3) the state's interest in not providing the additional procedure. 424 U.S. 319, 334–35 (1976).

The balancing of the *Mathews* factors here establishes that the government must provide notice; an inquiry into ability to pay; an adversarial hearing at which the arrestee is represented by counsel and has an opportunity to be heard, to present evidence, and to confront evidence offered by the government; an impartial decision-maker; and findings on the record by clear and convincing evidence that pretrial detention is necessary to serve a specific government interest.

> ### a.  The judicial officer must conduct an inquiry into ability to pay and make on-the-record findings concerning ability to pay

The first step in determining what further protections are required is determining whether a financial condition of release will result in de facto detention. As the Supreme Court has held,

if the government seeks to condition physical liberty on a payment, due process requires notice of the nature and significance of the financial information to be provided; an inquiry into the person's ability to pay; and findings on the record as to whether the person has the ability to pay. *See Turner v. Rogers*, 564 U.S. 431, 447–48 (2011) (applying the *Mathews* test and holding that, before the state may jail a person for not paying child support, the government must provide notice that ability to pay is a critical issue, an opportunity to be heard on the issue, and "an express finding by the court that the defendant has the ability to pay"); *Bearden*, 461 U.S. at 673 (holding that the state must inquire into whether nonpayment is willful before revoking probation); *see also ODonnell*, 251 F. Supp. 3d at 1143–61 (requiring an inquiry into ability to pay and notice to arrestees about the significance of the financial information they are asked to provide).

If, after the required notice and inquiry into ability to pay, the government determines that the person cannot pay the amount required, then further procedures are required to ensure the accuracy of any finding that pretrial wealth-based detention is necessary to serve a compelling interest in any particular case.

### b. The judicial officer must provide additional procedural safeguards to ensure the accuracy of the pretrial detention decision

The substantive rights to pretrial liberty and against wealth-based detention require safeguards to ensure that the preventive pretrial detention decision is accurate and that detention of presumptively innocent people remains the "carefully limited exception." *Salerno*, 481 U.S. at 746 (citing *Mathews*, 424 U.S. at 335).

In *Salerno*, the Court upheld the procedural protections provided by the Bail Reform Act and emphasized that an order of detention may be issued under the Act only after the provision of robust procedural safeguards, including: a "full-blown adversary hearing," *id.* at 750,

14

"findings of fact" by "clear and convincing evidence," and a "statement of reasons for a decision to detain," *id.* at 752. Balancing the individual and government interests at stake, the *Mathews* test makes clear that due process requires similar safeguards to those features of the Bail Reform Act emphasized by the Supreme Court in upholding it.

The basic procedures that due process requires prior to the deprivation of *any* liberty interest are well established. Most of them apply even in the post-conviction context, where a person's liberty interest is less than that of the Plaintiffs, who are pretrial detainees and presumptively innocent. In *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973), the Court explained what due process requires at a probation revocation hearing for a person whose liberty interest has been diminished by a criminal conviction:

> (a) "notice" of the critical issues to be decided at the hearing;
>
> (b) "disclosure" of the evidence presented by the government at the hearing;
>
> (c) an "opportunity to be heard in person and to present witnesses and documentary evidence";
>
> (d) "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)";
>
> (e) a "neutral and detached" [factfinder]; and
>
> (f) findings and reasons on the record of "the evidence relied on."

*See also Morrissey v. Brewer*, 408 U.S. 471, 488–89 (1972) (holding that "the minimum requirements of due process" require the same six procedural protections in the context of parole revocation of a convicted and sentenced person).[2] Because a bail hearing implicates the

---

[2] These principles have also been applied to incarceration for nonpayment of child support, *Turner*, 564 U.S. at 447, and the revocation of prisoners' good time credits, *Wolff v. McDonnell*, 418 U.S. 539, 565 (1974).

fundamental right to pretrial liberty, each of these safeguards is required. As described below, pretrial detention also calls for a heightened evidentiary burden and a right to assistance of counsel.

> ### i. The judicial officer must prove by clear and convincing evidence that pretrial detention is necessary to mitigate either a risk of flight or a danger to the community

When the government seeks to infringe the fundamental right to bodily liberty prior to or absent a criminal conviction, the government bears a heightened evidentiary burden.  As the Supreme Court explained in its seminal procedural due process decision in *Addington v. Texas*, 441 U.S. 418, 432–33 (1979), the deprivation of the fundamental right to bodily liberty requires a heightened standard of proof beyond a mere preponderance in order to ensure the accuracy of the decision. Since *Addington*, the Supreme Court has never required a lower standard than "clear and convincing" evidence in any context in which bodily liberty is at stake.

In *Addington*, the Supreme Court held that the standard of proof required before a person can be confined in state custody for mental illness based on the possibility of future dangerousness must, under the Due Process Clause, be "equal to or greater than" the "clear and convincing" evidentiary standard.  *Id.* at 432.  The Court applied the *Mathews* balancing test. First, the Court articulated the government's interest: "to protect the community from the dangerous tendencies of some who are mentally ill." *Id.* at 426. However, the Court explained: "Since the preponderance standard creates the risk of increasing the number of individuals erroneously committed, it is at least unclear to what extent, if any, the state's interests are furthered by using a preponderance standard in such commitment proceedings." *Id.* The Court then balanced the important private interests and concluded that "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process

requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id*. at 427.

In determining under *Mathews* that the appropriate standard was above a mere preponderance, the Court explained that requiring proof "beyond a reasonable doubt" was too stringent, particularly because of the noncriminal nature of the commitment and because, "given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment." *Id*. at 432. Instead, the Court explained, it had consistently required an intermediate "clear and convincing" standard of proof to protect against erroneous deprivations of particularly important individual interests in other contexts, such as deportation and denaturalization. *Id*. at 424. The "clear and convincing" standard enables the government to achieve its interest when it has a convincing basis but rigorously protects the fundamental individual rights at stake. *See id.*

The Court has reached the same conclusion in every other context in which a person's physical liberty is at stake. *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982) ("This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'"). Thus the Court has required the "clear and convincing" evidence standard in deportation proceedings, denaturalization proceedings, civil commitment proceedings, proceedings for the termination of parental rights, cases involving allegations of civil fraud, and a variety of other kinds of civil cases. *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 282–83 (1990).

In *Foucha v. Louisiana*, 504 U.S. 71, 82 (1992), the Court again explained the importance of the "clear and convincing" standard and struck down, on due process grounds,

17

Louisiana's statutory scheme for perpetuating the confinement of those acquitted on the basis of insanity in criminal trials. The Court held that "[t]he State may . . . confine a mentally ill person if it shows by clear and convincing evidence that the individual is mentally ill and dangerous." *Id*. at 80 (quotation and citation omitted). In discussing its holding, the Court relied on *Salerno*, explaining that the Court had upheld the federal statute's preventive detention mechanism in part because it required findings of dangerousness by the longstanding "clear and convincing" standard:

> Unlike the sharply focused scheme at issue in *Salerno*, the Louisiana scheme of confinement is not carefully limited. Under the state statute, Foucha is not now entitled to an adversary hearing at which *the State must prove by clear and convincing evidence* that he is demonstrably dangerous to the community.

*Foucha,* 504 U.S. at 81 (emphasis added).

Lower courts, interpreting *Salerno*, have consistently emphasized the necessity of (at a minimum) the "clear and convincing" standard in the context of pretrial detention. *Lopez-Valenzuela* stuck down the Arizona pretrial detention statute in part because the Arizona law, unlike the federal Bail Reform Act, did not require the government to prove by "clear and convincing evidence" that an individual arrestee's detention was necessary. 770 F.3d at 784–85. As the Ninth Circuit explained, one of the features that *Salerno* explicitly relied on was that the Act required the government "to prove by 'clear and convincing evidence' that the individual presented 'a demonstrable danger to the community' and that 'no conditions of release c[ould] reasonably assure the safety of the community.'" *Id*.

The Louisiana Fourth Circuit Court of Appeals has also recently recognized that a denial of bail without a contradictory hearing conducted under a "clear and convincing" evidentiary standard would violate the Due Process Clause of the Constitution. In *State v. Butler*, the court considered the denial of a defendant's bail in light of the Louisiana Constitution's guarantee of

18

bail "by sufficient surety" to all, with the exception of capital crimes, certain violent crimes, and certain drug crimes. 2011-K-0879 (La. App. 4 Cir. 7/28/11), 2011 WL 12678268 at *1. Louisiana's constitution explicitly allows a denial of bail for crimes of violence and drug crimes only when "after a contradictory hearing, the judge or magistrate finds by *clear and convincing* evidence that there is a substantial risk that the person may flee or poses an imminent danger or any other person or the community." La. Const. art. I, § 18 (emphasis added). The court in *Butler* held that the defendant's detention without bail was unconstitutional, violating both the Louisiana Constitution and the Due Process Clause of the U.S. Constitution. *Butler*, at *1 ("The defendant's argument that the constitution requires a contradictory hearing where the State bears the burden is persuasive. Without such a hearing the defendant would be deprived of those procedural safeguards which the Due Process Clause requires before the State may deprive a presumptively innocent person of liberty.") (citing *Salerno*, 481 U.S. 739 (1987)). The Louisiana Supreme Court denied the state's writ seeking review of this decision and its application for reconsideration. 78 So. 3d 442; 75 So. 3d 132.

There is no reason that these Louisiana and federal court holdings concerning the appropriate evidentiary standard to detain a person without bail should be applied differently when a court issues a de facto order of pretrial detention using money bond. Various state courts have also held this standard to apply.[3]

---

[3] *See State v. Ingram*, 165 A.3d 797, 803, 805 (N.J. 2017) (interpreting state statute to require "clear and convincing evidence" when a person is preventively detained on the basis of his potential future dangerousness); *Wheeler v. State*, 864 A.2d 1058, 1065 (Md. App. 2005) ("We are persuaded, however, that 'preventive detention' may not be ordered unless the judicial officer is persuaded by clear and convincing evidence that no condition or combination of conditions of pretrial release can reasonably protect against the danger that the defendant poses to the safety of an identifiable person or to the community at large."); *Brill v. Gurich*, 965 P.2d 404, 409 (Okla. 1998); *Lynch v. United States*, 557 A.2d 580, 581 (D.C. 1989). Most recently, in *Humphrey*, the California Court of Appeal held under the federal Constitution that "[i]f [a] court concludes that an amount of bail the defendant is unable to pay is required to ensure his or her future court appearances, it may impose that amount only upon a determination by clear and

While courts have amply addressed the evidentiary standard to detain someone on the basis of dangerousness, the case law regarding what evidentiary standard due process requires for detention based on a risk of flight is surprisingly thin given the importance of this legal question to pretrial justice. Perhaps this is because appellate courts and the Supreme Court have difficulty resolving legal standards applied to pretrial detention before those cases become moot. Indeed, the Supreme Court has not ruled on a constitutional issue relating to pretrial detention since *Salerno*, more than thirty years ago. Although the legal issue should be uncontroversial in light of *Addington*, *Foucha*, and application of the *Mathews* factors, counsel has been unable to find precedent from any circuit addressing the question of whether, as a matter of constitutional law, the "clear and convincing" evidence standard applies to determinations regarding pretrial detention based on a risk of flight.

The intermediate standard of "clear and convincing" evidence should apply regardless of whether the government seeks to detain a person pretrial based on a purported risk of danger to the community or a purported risk of flight, because the vital private right at stake in pretrial liberty is the same.  And the Supreme Court has already held in *Santosky*, *Addington*, and *Foucha* that fundamental private interests require a heightened burden of proof before the government can infringe upon them, because they are "particularly important" and "more substantial than mere loss of money."  *Santosky*, 455 U.S. at 756.  There is no compelling reason that "the degree of confidence our society thinks [it] should have in the correctness of factual conclusions," *id*. at 755, should be lower when the question is whether a person poses a risk of

---

convincing evidence that no less restrictive alternative will satisfy that purpose." 19 Cal. App. 5th 1006, 1037 (Cal. Ct. App. Jan. 25, 2018).

flight than when the question is whether the person poses a danger to other people in the community.

Analogous case law from the immigration context, where the liberty interests are more constrained than in the pretrial context, supports this conclusion. *See Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (requiring "clear and convincing evidence" regardless of whether the government seeks detention based on flight or dangerousness because "due process places a heightened burden of proof [where] the individual interests at stake . . . are both particularly important and more substantial than mere loss of money").

Only one court appears to have addressed in depth the question of whether the burden of proof the government must satisfy to detain someone due to a concern about flight risk is the same as the burden of proof when the concern is community safety. In *Kleinbart v. United States*, 604 A.2d 861, 868 (D.C. 1992), the D.C. Court of Appeals held that the "clear and convincing" evidence standard should apply to determinations about whether to order pretrial detention based on flight risk. The court explained that "[a] defendant's liberty interest is no less—and thus requires no less protection—when the risk of his or her flight, rather than danger, is the basis for justifying detention without right to bail." *Id.* at 870. The court therefore held: "Although the federal Bail Reform Act could be construed—purely as a matter of statutory construction—to require only a preponderance standard in risk of flight cases . . . we believe that *Salerno*'s emphasis on the "clear and convincing evidence" standard to sustain the constitutionality of that statute as applied to danger necessarily carries over, as a requirement of due process, to risk of flight cases." *Id.*[4]

---

[4] This analysis has been adopted by the American Bar Association's Criminal Justice Standards. ABA Standard 10-5.8 explains that the "clear and convincing" standard applies to decisions relating to dangerousness and risk of flight. Courts have long looked to the Standards for guidance when answering constitutional questions about the

Thirty years ago (and prior to *Foucha*), the Fifth Circuit held that a federal court could detain a defendant as a flight risk so long as the court found by a preponderance of the evidence that no conditions existed to reasonably mitigate the person's risk of flight. *United States v. McConnell*, 842 F.2d 105, 110 (5th Cir. 1988). The *McConnell* opinion was limited, however, to the question of what standard was required under the Bail Reform Act. The *McConnell* panel was not presented with the question of what burden of proof would be required by the Constitution. *Id.* at 107 ("McConnell maintains that the imposition of a financial condition of bail which a defendant cannot meet violates the eighth amendment and the Bail Reform Act of 1984."). Similarly, the authorities relied upon by *McConnell* in applying a statutory preponderance-of-the-evidence standard to questions of flight risk did not consider the burden of proof required by the Constitution. *Id.* (citing *United States v. Trosper*, 809 F.2d 1107 (5th Cir. 1987) (challenging statutory presumption of flight risk in 18 U.S.C. § 3142); *United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985) (noting silence of Bail Reform Act on the proper standard and applying preponderance standard without any discussion of constitutional requirements); *United States v. Medina*, 775 F.2d 1398 (11th Cir. 1985) (same)). Thus *McConnell* was based on statutory interpretation of the Bail Reform Act and made no holding concerning procedural due process, because the issue was not before the court.

In *United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985), a pre-*Salerno* case, the Ninth Circuit held that the government failed to prove, by a preponderance of the evidence, that the defendant was a flight risk and reversed an order of pretrial detention. In the process, the court held that the *statutory* standard for determining flight risk under the Bail Reform Act was a

---

appropriate balance between individual rights and public safety in the field of criminal justice. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010); *Strickland v. Washington*, 466 U.S. 668, 688–89 (1984); *United States v. Teague*, 953 F.2d 1525, 1533 n.10 (11th Cir. 1992).

"clear preponderance of the evidence" as opposed to the "clear and convincing" standard later upheld in *Salerno* for the question of future dangerousness. In reversing the lower court's detention order, the Ninth Circuit made "no attempt to analyze the constitutional ramifications of its decision." *Id*. at 1412 (Boochever, J., concurring and dissenting in part). Judge Boochever, however, addressed the constitutional question in his concurring and dissenting opinion, applying the *Mathews* balancing test. *Id*. at 1413–15. He explained:

> [T]he consequences to the defendant from an erroneous pretrial detention are certain and grave. The potential harm to society, although also significant, is speculative, because pretrial detention is based on the possibility, rather than the certainty, that a particular defendant will fail to appear. Moreover, society's interest in increasing the probability of detention is undercut by the fact that it has no interest in erroneously detaining a defendant who can give reasonable assurances that he will appear. I conclude therefore that the injury to the individual from an erroneous decision is greater than the potential harm to society, and that under *Addington* due process requires that society bear a greater portion of the risk of error: the government must prove the facts supporting a finding of flight risk by clear and convincing evidence.

*Id*. at 1415. [5]

Thus, although the constitutional issue of what ultimate standard of proof must apply at a pretrial detention hearing appears to be one of first impression in this Court, the holdings and reasoning in *Addington*, *Foucha*, *Santosky*, *Salerno*, *Lopez-Valenzuela*, *Kleinbart*, and *Humphrey* demonstrate that the deprivation of the fundamental right to physical liberty requires a

---

[5] Counsel has found a number of federal cases after *Motamedi* that likewise apply a "preponderance" standard to risk of flight determinations as a matter of *statutory interpretation* under the Bail Reform Act, but none of those cases raised or decided the constitutional issue, let alone engaged in analysis of the issue in light of *Addington*, *Foucha*, *Santosky*, *Salerno*, *Mathews,* and *Lopez-Valenzuela*.  In *United States v. Cos*, No. CR 05-1619JB, 2006 WL 4061168, at *4 (D.N.M. Nov. 15, 2006), the court addressed the different question of when previously valid pretrial detention becomes so prolonged that it violates due process. Although that question is not presented here, the court noted that it could not find significant federal case law on the question of the burden of proof in the pretrial detention context: "In researching this issue, the Court has found only one judicial opinion considering which party bears the burden of proof when a court reviews the constitutionality of a pretrial detention." *Id*. (citing *Motamedi*, 767 F.2d 1403)).

heightened standard of proof whether the government is considering alternatives to mitigate a risk of flight or alternatives to mitigate a risk of danger to the community.[6]

### ii. Arrestees must be represented by counsel

Both the Due Process Clause and the Sixth Amendment require representation by counsel at a pretrial detention hearing. The *Mathews* balancing test dictates the need for counsel to protect against the erroneous deprivation of liberty in the pretrial context. The "risk of an erroneous deprivation" of that right is high absent counsel because detention hearings can be complex. These hearings involve specialized knowledge and skill well outside the scope of a lay defendant, especially in the days immediately following an arrest, when a person is in crisis, removed from her family and community, and confined to a jail cell. Even the State has an interest in providing a lawyer because the State has an interest in the accuracy of the determination, avoiding needless and costly pretrial incarceration, and allowing continuity of representation throughout the case.

The State's only interest in not providing a lawyer is financial, which is not enough on its own to outweigh the vital individual right and the enormous risk of erroneous deprivation. *Cf. Fuentes v. Shevin*, 407 U.S. 67, 92 n.22 (1972) ("A prior hearing always imposes some costs in time, effort, and expense, and it is often more efficient to dispense with the opportunity for such a hearing. But these rather ordinary costs cannot outweigh the constitutional right.").

---

[6] And although the formal rules of evidence need not apply at detention hearings, the findings of "clear and convincing evidence" on which the government relies for the complete incapacitation of a presumptively innocent person must meet minimal standards of reliability. *See, e.g.*, *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) ("[W]hile the informality of bail hearings serves the demands of speed, the magistrate or district judge must also ensure the reliability of the evidence, by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question."); *United States v. Accetturo*, 783 F.2d 382, 389 (3d Cir. 1986); *United States v. Acevedo-Ramos*, 755 F.2d 203, 207–08 (1st Cir. 1985); *Reem v. Hennessy*, No. 17-cv-06628-CRB, 2018 WL 1258137, at *3 (N.D. Cal. March 12, 2018).

The Sixth Amendment also requires the government to provide counsel at pretrial detention hearings. The right to counsel applies at every critical stage of criminal proceedings, which is defined as any stage "where 'the accused required aid in coping with legal problems or assistance in meeting his adversary,' and the 'substantial rights of the accused may be affected.'" *McAfee v. Thaler*, 630 F.3d 383, 391 (5th Cir. 2011) (quoting *United States v. Ash*, 413 U.S. 300, 311, 313 (1973)). Given the complexity of these hearings for a layperson and the fundamental liberty interest at stake, a pretrial detention hearing is a "critical stage" for Sixth Amendment purposes.  *See Bell v. Cone*, 535 U.S. 685, 696 (2002) (explaining that a "critical stage" requiring counsel is "a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused."); *Coleman v. Alabama*, 399 U.S. 1, 9–10 (1970) (holding that Sixth Amendment required the presence of counsel at preliminary hearing because, in part, counsel could make effective arguments about necessity of bail); *Higazy v. Templeton*, 505 F.3d 161, 172 (2d Cir. 2007) (noting that bail hearings are a "critical stage"); *Smith v. Lockhart*, 923 F.2d 1314, 1319 (8th Cir. 1991) (holding that hearing on bail reduction motion was a critical stage of proceeding requiring representation by counsel); *United States v. Johnson*, 516 F. Supp. 696, 699 (E.D. Pa. 1981) (holding that defendant had right to counsel at post-arrest bail hearing).[7]

---

[7] Empirical studies have also demonstrated the importance of representation in bail hearings. *See, e.g.*, Douglas L. Colbert et al., *Do Attorneys Really Matter?*, 23 Cardozo L. Rev. 1719, 1720, 1773 (2002) (discussing a study comparing case outcomes for represented versus unrepresented arrestees and noting that "legal representation at bail often makes the difference between an accused regaining freedom and remaining in jail prior to trial"); Ernest J. Fazio, Jr. et al., Nat'l Inst. of Justice, U.S. Dep't of Justice, NCJ 97595, *Early Representation by Defense Counsel Field Test: Final Evaluation Report* 208, 211 (1985), http://www.ncjrs.gov/pdffiles1/Digitization/97595NCJRS.pdf (concluding that representation by counsel "had a significant impact on test clients' pretrial release status" in a study of the effect of public defender representation at bail hearings in three counties across the U.S.).

Currently, the Orleans Public Defender provides representatives in First Appearance hearings for those arrestees whom Magistrate Cantrell qualifies as indigent. The Orleans Public Defender provides this representation voluntarily, however, and there is no statute, ordinance, or criminal district court order requiring it to do so, and the budget of the agency is regularly under stress. Any declaratory relief granted by this Court should include a declaration of the right to counsel at pretrial detention hearings to ensure that the practice of providing counsel continues.

### c. Magistrate Cantrell issues orders of detention without providing the required procedural safeguards

Magistrate Cantrell provides no notice that ability to pay will be a critical issue at the hearing and then makes no inquiry into a person's ability to pay.  Furthermore, Magistrate Cantrell provides no notice that consideration of alternative conditions of release is a critical issue at the hearing, and he makes no consideration of whether alternative conditions of release would achieve the same goal. (SUMF ¶ 19.) Magistrate Cantrell even threatens lawyers should they attempt to make arguments on the issue. (SUMF ¶ 15.)

Because he does not inquire into ability to pay, Magistrate Cantrell does not know whether the requirement to pay money bail as a condition of release in fact operates as an order of detention. As a result, Magistrate Cantrell does not make the findings on the record required to explain why a person must be ordered detained prior to trial (i.e. that no condition or combination of alternative conditions could protect against a particular risk of flight or danger to the community).  And because he makes no findings at all and routinely does not permit evidence or argument on the question, Magistrate Cantrell does not employ any legal standard at all, let alone the heightened evidentiary standard required by federal law, before a person may be detained. Therefore, pretrial detention of the Plaintiff class violates procedural due process.

**B. Magistrate Cantrell's Reliance Upon the 3% Fee on Commercial Sureties to Fund the Operations of his Court is a Conflict of Interest that Violates the Due Process Clause**

Long-settled case law recognizes a violation of due process rights when a litigant's case is judged by a person who has an institutional financial interest in the outcome of the case, such that a possible temptation exists that could influence the judgment.

Magistrate Cantrell is responsible for determining conditions of pretrial release for arrestees in Orleans Parish. He also has executive authority—shared with the other judges—for managing the court's JEF.  (SUMF ¶ 28.) And Louisiana law also provides that the judges receive 1.8% of every secured money bond over $100 posted by a commercial surety into their JEF, which operates as the discretionary budget of the court. (*Id.* ¶¶ 25–27.)   In the last five years, 19–26% of the revenue funding Magistrate Cantrell's chambers and the general operations of the Orleans Parish Criminal District Court has been derived from this percentage fee. (*Id.* ¶ 31.)  Do Magistrate Cantrell's dual functions — his judicial role in setting conditions of pretrial release and his executive role in controlling a court fund that is financed by fees on commercial sureties — present a conflict of interest that violates the due process rights of the Plaintiff class?

This Court answered this question in the affirmative over twenty-five years ago, when Judge Mentz decided *Augustus v. Roemer*, 771 F. Supp. 1458 (E.D. La. 1991). And just last year, Judge Vance employed the same legal reasoning to find that an unconstitutional conflict of interest existed in the judges of the Orleans Parish District Court's control of revenue from fines and fees and their role in determining whether a defendant could afford to pay fines and fees. *Cain v. City of New Orleans*, 281 F. Supp. 3d 624, 652–59 (E.D. La. 2017).  The same analysis applies here.

1.  **Binding precedent dictates that judges' institutional conflicts of interest violate the due process rights of those appearing before them**

The precedent relied upon by Judges Mentz and Vance, which is equally applicable here, dates back nearly a century. In *Tumey v. Ohio*, 273 U.S. 510 (1927), the Court considered a statutory framework that empowered mayors to adjudicate violations of Ohio's Prohibition Act, paid their administrative "costs" for each conviction, and allocated to the municipality half of the fines collected for violations of the Prohibition Act. The Court found that this system violated due process for two reasons. First, the costs assessed on each convicted defendant were paid directly to the mayor, creating a "direct personal pecuniary interest in convicting the defendant who came before him for trial."*Id.* at 523. Second, half of the fines assessed by the mayor in his role as judge were allocated to the municipality's general operating fund—"substantially adding to the income of the village"—over which the mayor was executive. *Id.* at 533.

> With his interest as mayor in the financial condition of the village and his responsibility therefor, might not a defendant with reason say that he feared he could not get a fair trial or a fair sentence from one who would have so strong a motive to help his village by conviction and a heavy fine?

*Id.* The Court concluded that the defendant had been deprived of due process, both by the mayor's personal interest in collecting the costs of the adjudication and in his "official motive to convict and to graduate the fine to help the financial needs of the village." *Id.* at 535.

The Court revisited *Tumey* nearly fifty years later in the case of *Ward v. Village of Monroeville*, 409 U.S. 57 (1972). The Mayor of Monroeville acted as not only the judge for violations of municipal ordinances and traffic violations, but also the chief executive of the village. The fines, costs, and fees that the mayor's court collected accounted for a substantial portion of the village's income, ranging from 36%–51% of village revenue over a four-year period. 409 U.S. at 58. The Court rejected the argument that *Tumey* stands for the rule that a

28

violation of due process exists only if a direct financial interest of the judge could be

demonstrated. *Id.* at 60–61.

> [T]he test is whether the mayor's situation is one 'which would offer a possible
> temptation to the average man as a judge to forget the burden of proof required to
> convict the defendant, or which might lead him not to hold the balance nice, clear,
> and true between the state and the accused . . . .' [*Tumey*, 273 U.S.] at 532 . . . .
> Plainly that 'possible temptation' may also exist when the mayor's executive
> responsibilities for village finances may make him partisan to maintain the high
> level of contribution from the mayor's court.

*Ward*, 409 U.S. at 60.

Since *Ward*, the Supreme Court has upheld on numerous occasions the fundamental

principle that due process requires a neutral judicial forum. *Concrete Pipe & Prods. v. Constr.

Laborers Pension Tr.*, 508 U.S. 602, 617 (1993) ("[D]ue process requires a 'neutral and detached

judge in the first instance.'"); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986); *Connally v.

Georgia*, 429 U.S. 245 (1977); *Hortonville Joint Sch. Dist. v. Hortonville Educ. Ass'n*, 426 U.S.

482 (1976); *Gibson v. Berryhill*, 411 U.S. 564 (1973).

The Supreme Court most recently addressed the rule for financial conflicts of interest in

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883 (2009), in which it reaffirmed that the

difficulty of rooting out actual bias has resulted in courts implementing the due process clause

"by objective standards that do not require proof of actual bias." Courts must rely on "a realistic

appraisal of psychological tendencies and human weaknesses" to determine whether the alleged

conflict of interest "poses such a risk of actual bias or prejudgment that the practice must be

forbidden if the guarantee of due process is to be adequately implemented." *Id.* at 883–84

(quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

The Fifth Circuit further defined the contours of this rule in *Brown v. Vance*, 637 F.2d

272 (5th Cir. 1981), a consolidated class action challenging Mississippi's method of funding

justices of the peace. At the time of filing, justices of the peace were not salaried by the state but, instead, received a fee for each case filed in their court. The justices also had overlapping jurisdictions. Plaintiffs argued that this resulted in forum shopping by police—they brought more cases before justices of the peace whom they knew to have higher conviction rates.  As Judge Wisdom summarized: "the relevant constitutional fact is that a judge's bread and butter depend on the number of cases filed in his court." 637 F.2d at 276. The court went on to reaffirm the principle that evidence of actual bias was unnecessary for such due process claims. The mere presence of a "possible temptation . . . to forget the burden of proof required to convict the defendant" was a per se violation of due process. *Id.* at 282 (quoting *Tumey*, 273 U.S. at 532).

> In *Tumey* and *Ward* the Supreme Court . . . was not as interested in the probity of an individual judge or perhaps even, of the great majority of judges. It was interested rather in the inherent defect in the legislative framework arising from the vulnerability of the average man—as the system works in practice and as it appears to defendants and to the public. The Court's inquiry there and our inquiry here is not whether a particular man has succumbed to temptation, *but whether the economic realities make the design of the fee system vulnerable to a "possible temptation" to the "average man" as judge.*

*Id.* at 284 (emphasis added).

As this line of cases demonstrates, proving a due process violation does not require a showing of actual bias against litigants—bias is presumed where substantial personal or structural incentives exist. These institutional or structural incentives violate due process "even if the pecuniary interest is only an indirect outgrowth of a public official's desire to protect official funds."  *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 700 (7th Cir. 1982) (quoting *Meyer v. Niles Township*, 477 F. Supp. 357, 362 (N.D. Ill. 1979)).[8]  The law turns on

---

[8] In *United Church*, the court confronted a system in which a statutorily created Commission would benefit financially from the proceedings that it conducted.  The Commission responded that the statute was constitutional because there was "no personal benefit to the Commission or the commissioners."  *Id.* at 699–700.  But the court

"objective standards that do not require proof of actual bias." *Caperton*, 556 U.S. at 883. Courts must rely on "a realistic appraisal of psychological tendencies and human weaknesses" to determine whether the alleged conflict of interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.* at 883–84 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

### 2. *Augustus v. Roemer* and the Louisiana Legislature's response to this Court

In 1991, this Court struck down a similar New Orleans-specific statute that gave judges a percentage of each money bond that they set to fund the court budget. *Augustus v. Roemer,* 771 F. Supp. 1458, 1473 (E.D. La. 1991). This Court based its holding on several independent grounds, including that the judicial financial conflict of interest violated a long line of Supreme Court precedent concerning judicial neutrality.  *Id.* As this Court explained:

> …an important purpose of the statutes is to raise revenue to help run the respective parish criminal justice systems. This plainly creates a temptation for the judges to forego due process and assess high bail amounts in order to maintain the level of funding necessary to run their respective criminal justice systems. Therefore, we find that this creates a situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial.

> *Id*. (quotations omitted).

After this Court's constitutional ruling, the Louisiana legislature took an extraordinary step.  Instead of fixing the problem in New Orleans, the State legislature repealed the unconstitutional New Orleans-specific law and passed a materially identical statute enshrining the unconstitutional conflict of interest *statewide*.  *See* La. R.S. §§ 13:1381.5, 22:822.  In the process of attempting to insulate the new law from those who might challenge it (by giving a

---

explained that, under *Ward*, "the disqualifying financial stake need not be direct or positive." *Id.* at 700 (internal quotations omitted).

financial cut to other actors, including the District Attorney, the Sheriff, and the Public

Defender), the legislature slightly reduced the percentage that Orleans Parish Criminal District

Court judges received from each bond to 0.8% from the 2% that they had received in *Roemer*.

Instead, they gave 0.4% each to the District Attorney, the Sheriff, and the Public Defender.  *Id.*

The legislature's flagrant rebuke of *Roemer* was not challenged.  Instead, after an

extensive lobbying campaign by Orleans Parish Criminal District Court judges, the legislature

decided to grant Orleans Parish Criminal District Court judges an *additional* 1% of each money

bond that they set, increasing their total cut to 1.8%, nearly the same as they had been receiving

prior to *Roemer*.  *See* La. R.S. § 22:822(B)(3).

In 2000, several plaintiffs brought a class action lawsuit challenging different aspects of

that statutory scheme on different grounds. *Broussard v. Parish of Orleans*, 318 F.3d 644 (5th

Cir. 2003). The plaintiffs in *Broussard* never made any claim of *judicial* bias, which is the core

of Count Two of the Complaint in this case. The plaintiffs in *Broussard* brought suit against

multiple Louisiana sheriffs and the Orleans Parish Clerk of Court, alleging, among other

constitutional claims, that certain bail fees "[gave] sheriffs the partisan incentive to make

unnecessary charges to maintain sufficient funding for their respective departments." 318 F.3d at

661.  Thus, the claim in *Broussard* was that sheriffs—not judges—were biased to stack charges

because of the fees that the sheriffs might collect.   The Fifth Circuit affirmed this Court, holding

that none of the claims raised in that case had constitutional merit.  *Id.* at 647.  The Fifth Circuit

thus overruled some portions of *Roemer* that have no relevance to the claim in this case or to

*Roemer*'s unassailable judicial financial conflict of interest holding. Magistrate Cantrell

previously argued that *Broussard* counseled dismissal of this case (ECF No. 65), an argument

that this Court disposed of, noting that *Broussard*'s consideration of a financial conflict for

32

sheriffs was inapplicable to this case of judicial bias. (ECF No. 81 at 6); *see also Cain*, 281 F. Supp. 3d at 656 ("Unlike the sheriffs in *Broussard*, the Judges in this case do exercise a judicial function when they are required to determine ability to pay fines and fees.").

### 3. Magistrate Cantrell's conflict of interest in imposing secured bonds violates the Due Process Clause

Like the mayor in *Ward*, Magistrate Cantrell has an institutional conflict of interest in requiring secured financial conditions of release: he shares executive control of the Orleans Criminal District Court's General Fund,[9] a 1.8% fee on commercial surety bonds is deposited into the General Fund, and Magistrate Cantrell has responsibility for determining conditions of release.

It is undisputed that the fee in question constitutes nearly 25% of the court's General Fund. This is a sufficient amount under the *Ward* line of cases. In *Rose v. Village of Peninsula*, 875 F. Supp. 442 (N.D. Ohio 1995), the district court found that a mayor's court generating between 11.8–13.9% of the village's general fund through fines and fees on defendants supported a financial conflict of interest. 875 F. Supp. at 450. The court reasoned, "Certainly, any person suddenly deprived of 10% or more of his income would find the loss 'substantial.'" *Id.* at 451. The Sixth Circuit also held that there is no concrete percentage for the amount of revenue that would create a conflict of interest, but as little as 4% could satisfy such a claim. *See DePiero v. City of Macedonia*, 180 F.3d 770, 780 (6th Cir. 1999) ("We see no need to split hairs of what is a 'substantial' figure, however, if the mayor's executive authority and administrative responsibilities preclude him from serving as a neutral and detached decisionmaker.").

---

[9] The Orleans CDC Judges' control of the funds collected through the bail bond fee is demonstrated by recent history. Prior to 2012, the judges of the Orleans Criminal District Court used the money collected from the 1.8% bail bond fee to pay for their own personal insurance benefits, including benefits for their spouses. This practice of using the general fund to pay supplemental benefits ceased only after public disclosure by the Louisiana Legislative Auditor. No structural control or mechanism prevents the resumption of this practice, or one like it, in the future.

In this case, $1 million generated annually by the 1.8% fee is a substantial portion of the court's total $4 million General Fund revenues. (*See* SUMF ¶¶ 33–34.) Former Judge Calvin Johnson spoke to the necessity of funding the court's operations through fees: "I was as guilty of that as any when I was on the bench, but you have to fund yourself in some fashion,' Johnson said. 'And so you did it on the backs of the poor.'" (SUMF ¶ 34.) Last year, Judge Vance ruled that the Orleans Criminal District Court judges' collection of other court costs and fees deposited to the JEF, and amounting to 25% of the JEF balance, was a substantial institutional incentive that "create[d] an impermissible conflict of interest when they determine, or are supposed to determine, [criminal defendants'] ability to pay fines and fees." *Cain*, 281 F. Supp. 3d at 659.

## V.   Conclusion

Magistrate Cantrell requires that members of the Plaintiff Class pay a secured money bond as a condition of their pretrial release. He does so without any inquiry into their ability to pay that amount of money, discriminatorily jailing people on the basis of their poverty in violation of the Equal Protection and Due Process Clauses. Magistrate Cantrell's requirement of secured financial conditions of release function as de facto orders of detention for the Plaintiff Class, a deprivation of a fundamental liberty interest for which Magistrate Cantrell does not make the requisite substantive findings or provide the proper procedural safeguards. Finally, Magistrate Cantrell has an inherent bias in every money bail determination he makes, as the funding of his court substantially relies upon fees tied to the value of secured bonds he imposes. As supported by the uncontested facts fully described in Plaintiffs' *Statement of Uncontested Material Facts*, Plaintiffs request that a declaratory judgment issue in their favor.

Respectfully submitted,

*/s/ Eric Foley*
Eric A. Foley, La. Bar No. 34199, T.A.
Katie M. Schwartzmann, La. Bar No. 30295
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, La 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
eric.foley@macarthurjustice.org
katie.schwartzmann@macarthurjustice.org

*/s/ Alec Karakatsanis*
Alec Karakatsanis, D.C. Bar No. 999294
Founder and Executive Director
Civil Rights Corps
910 17th Street NW, Fifth Floor
Washington, DC 20006
(202)-681-2409
alec@civilrightscorps.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing is being filed using the Court's CM/ECF system, which provides notice to all parties.

*/s/ Eric Foley*
Eric Foley