# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| **ADRIAN CALISTE ET AL** | * | | **CIVIL ACTION** |
| | * | | |
| **versus** | * | | **No. 17-6197** |
| | * | | |
| **HARRY E. CANTRELL** | * | | **SECTION "L" (5)** |

## ORDER & REASONS

Before the Court are Plaintiffs' and Defendant's Cross-Motions for Summary Judgment. R. Docs. 116 and 121. The parties have also filed in opposition. R. Docs. 120 and 130. Having considered the parties' arguments and the applicable law, the Court issues this Order & Reasons.

## I. BACKGROUND

On June 27, 2017, Plaintiffs Adrian Caliste and Brian Gisclair, individually and on behalf of others similarly situated, filed this action under 42 U.S.C. § 1983 against Orleans Parish Criminal District Magistrate Judge Harry E. Cantrell, alleging violations of their rights under the Fourteenth Amendment's Due Process and Equal Protection Clauses. R. Doc. 1 at 25. Plaintiffs are former criminal defendants who were in the custody of the Orleans Parish Sheriff's Office at the time the complaint was filed. R. Doc. 1 at 2-3. Defendant Cantrell is the Magistrate Judge for Orleans Parish Criminal District Court ("OPCDC"), where he is responsible for setting bail upon arrest and has a role in managing the expenditures of the Judicial Expense Fund. R. Doc. 1 at 3.

In Count One, Plaintiffs allege that Judge Cantrell routinely sets a $2,500 minimum secured money bond without first considering the facts of the case to determine whether a lower bond amount or an alternative condition of release might be appropriate. R. Doc. 1 at 6. Plaintiffs further aver that Judge Cantrell requires the use of a bail bond from a commercial (for-profit) surety and does not allow arrestees to post cash bail. R. Doc. 1 at 2. In Count Two, Plaintiffs contend that Judge Cantrell has a conflict of interest because under Louisiana law, 1.8% of a

bond amount collected from a commercial surety is allocated directly to the Court for its discretionary use. R. Doc. 1 at 2.

Plaintiffs moved to certify a class of similarly situated plaintiffs. R. Doc. 5. On March 16, 2018, the Court granted this motion and certified the class. R. Doc. 99. Plaintiffs now seek a declaratory judgement that Judge Cantrell's bond policy, which they assert results in the creation of a modern "debtor's prison," and financial conflict of interest are violations of Plaintiffs' constitutional rights. R. Doc. 1 at 26. Defendant, Judge Cantrell, denies Plaintiffs' allegations and seeks summary judgment dismissing Plaintiffs' complaint.

## II.    PRESENT MOTIONS

### A.  Plaintiffs' Motion for Summary Judgment (R. Doc. 116)

Plaintiffs have filed a Motion for Summary Judgment. R. Doc. 116. The Plaintiff Class seeks declaratory judgment on both of their claims. R. Doc. 116-1 at 4. First, Plaintiffs' argue that Judge Cantrell violates their Equal Protection and Due Process rights by jailing Plaintiffs when they are unable to pay set bonds. R. Doc. 116-1 at 5. Plaintiffs argue that Judge Cantrell's practice violates their rights against wealth-based detention and fundamental right to pretrial liberty because he sets bail without making findings that pretrial detention is necessary or making an inquiry into Plaintiffs' ability to pay. R. Doc. 116-1 at 6, 12, 26. Second, Plaintiffs argue that since Judge Cantrell shares executive control over funds that come partly from fees on the commercial surety bonds that he sets, he has a conflict of interest in the process of setting those bonds. R. Doc. 116-1 at 33. Plaintiffs allege that this conflict violates their due process right to a neutral and detached judge. R. Doc. 116-1 at 29. For these reasons, Plaintiffs move for summary judgment. R. Doc. 116-1 at 34.

Defendant responds in opposition. R. Doc. 120. First, Judge Cantrell argues that this Court lacks the power to direct him in the performance of his duties. R. Doc. 120 at 1. Judge

Cantrell argues that Plaintiffs have asked this Court to order him to follow certain protocols when he conducts bail hearings and that this Court lacks the power to direct him in this manner. R. Doc. 120 at 3. Second, regarding Plaintiffs' request for declaratory relief, Judge Cantrell argues that any such relief would be advisory because there is no justiciable controversy. R. Doc. 120 at 5. Judge Cantrell further argues that Plaintiffs' claims regarding his bail hearing protocol are moot because since this lawsuit he has in good faith changed his bail hearing procedures. R. Doc. 120 at 6. Understanding his heavy burden in proving mootness, Judge Cantrell has attached an affidavit describing his new colloquy and checklist used during bail hearings. R. Doc. 120-1.[1]

Third, Judge Cantrell argues that the procedures regarding management of the Judicial Expense Fund do not negate a fair tribunal because 1) the OPCDC can go to the state or parish if it needs more funds, 2) there is no quota or reward for adding to the fund, and 3) the judges have no personal interest in the money collected. R. Doc. 120 at 9-11. Additionally, Judge Cantrell argues that he benefits from a presumption of integrity and if this procedure makes him biased than all courts are biased because all collect fees from defendants in some way. R. Doc. 120 at 13. Finally, Judge Cantrell also argues that the fees incurred under Louisiana's bail bond statutes do not create an impermissible bias because the Fifth Circuit has held that such fees are reasonable administrative fees. R. Doc. 120 at 18.

### B. Defendant's Motion for Summary Judgment (R. Doc. 121)

In support of his motion for summary judgment, Defendant has submitted a memorandum identical to that submitted in response to Plaintiffs' motion for summary

---

[1] Although Judge Cantrell argues that he has already amended his bail procedures, there is some discrepancy between the statements in his affidavit where he uses language indicating in some places that he is currently following the new procedures and some language indicating that he will change his procedures in the future. Additionally, these statements contradict his current affirmation of Plaintiffs' statement of facts. R. Doc. 121-6, 121-7.

judgment. R. Doc. 121-1. In opposition, Plaintiffs have submitted a memorandum identical to that submitted in reply supporting their own motion. R. Doc. 130.

## III.    LAW AND ANALYSIS

The present motions raise questions of justiciability, the constitutionality of Judge Cantrell's bail procedures, and his conflict of interest when he has both judicial and executive power regarding revenues of the Judicial Executive Fund. The Court acknowledges the similarities between this case and *Cain v. City of New Orleans*, 283 F. Supp. 3d 624 (E.D. La. 2017) (Vance, J.). The Court draws as relevant from Judge Vance's excellent and thorough opinion, particularly as it relates to analysis of judicial conflict of interest.

### A.  Summary Judgment Standard

 Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996).

"[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Anderson*, 477 U.S. at 249-50. In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). Furthermore, a court must assess the evidence, review the facts and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). With these legal principles in mind, the Court turns to the parties motion which will be discussed in turn.

### B. Justiciability

Defendant Cantrell's motion for summary judgment raises several justiciability questions. First, Judge Cantrell argues that the claims in Count One are moot due to his voluntary cessation of the challenged bail procedures. Second, Judge Cantrell argues that Plaintiffs improperly seek a writ of mandamus compelling the actions of a state official. Finally, Judge Cantrell argues that the Court should abstain from granting declaratory relief in this case. The Court will discuss each argument in turn.

#### i. Mootness

The Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. Const. art. III, § 2. To satisfy this requirement, a plaintiff must have a personal interest in the case, not only at the outset, but at "all stages" of the lawsuit. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732-33 (2008) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). If a plaintiff begins a case with a sufficient personal interest but lacks that interest later in the case, the plaintiff's claims are moot. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 189 (2000).

This Court has held that Plaintiffs had the requisite personal interest for standing to bring these claims. R. Doc. 44 at 5-6. In this motion, Judge Cantrell argues that Plaintiffs have lost this personal interest and their claims are now moot. Judge Cantrell argues that since this lawsuit he intends to cease the allegedly unconstitutional bail procedures thus mooting Count One.

"Generally, any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006). When an action is rendered moot it must be dismissed. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990). However, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Laidlaw*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Accordingly, the Supreme Court has placed a "heavy burden of persuasion" on a defendant attempting to show mootness by voluntary cessation. *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968).

Judge Cantrell has filed an affidavit stating that since the inception of this litigation he has "revised the protocol [he] follow[s] in setting bail and now take[s] into consideration the following factors":[2]

- There will be no minimum monetary bail amount utilized when assessing and setting bail.

- The seriousness of the offense charged, including but not limited to whether the offense is a serious crime of violence or involves a controlled dangerous substance.

- The weight of the evidence against the defendant.

- The previous criminal record of the defendant.

---

[2] *See* FN 1 *supra*.

- The ability of the defendant to give bail.

- The nature and seriousness of the danger to any other person or the community that would be posed by the defendant's release.

- The defendant's voluntary participation in a pretrial drug testing program.

- The absence or presence in the defendant of any controlled dangerous substance.

- Whether the defendant is currently out on a bail undertaking on a previous felony arrest for which he is awaiting institution of prosecution, arraignment, trial, or sentencing.

- Any other circumstances affecting the probability of defendant's appearance.

- The type or form of bail.

- Amount and source of defendant's income.

- Defendant's employment status.

- Number and type of defendants.

- Recommendations of pre-trial services report.

- Should a defendant be unable to afford the amount set, they will be entitled to an adversarial hearing, wherein they have the right to be represented by counsel and to present any evidence and/or testimony and traverse (or deny) any evidence and/or testimony presented against them concerning the previously stated factors in determining the amount of bail.

R. Doc. 120-1 at 2-3. Judge Cantrell further avers that he will now state on the record his reasoning when setting bail. R. Doc. 120-1 at 3.

The Court does not doubt that Judge Cantrell is earnest in his present intent to modify his bail procedures. However, "allegations by a defendant that its voluntary conduct has mooted the plaintiff's case require closer examination than allegations that 'happenstance' or official acts of third parties have mooted the case." *Fontenot v. McCraw*, 777 F.3d 741, 747-48 (5th Cir. 2015) (quoting *Envt'l Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 n.4 (5th Cir. 2008)). Accordingly, the Court has closely examined Defendant's claims and is not satisfied that the

voluntary conduct has mooted Plaintiffs' claims regarding the alleged bail practices. Unlike cases where there has been a "formally announced change[]" regarding official policy, *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), here the Court and Plaintiffs must rely solely on Judge Cantrell's statement that he has changed his procedures and will not change them back again. Judge Cantrell has submitted no evidence of the implementation of these new bail procedures. These changes were made only after this litigation was commenced and Judge Cantrell's affidavit is not binding on his future procedures. For these reasons, the Court finds that Judge Cantrell has not met his heavy burden of convincing the Court that the challenged bail procedures could not reasonably be expected to recur. Therefore, Plaintiffs' claims are not moot.[3]

### ii. Mandamus

Next, Judge Cantrell argues that Plaintiffs' have requested a writ of mandamus disguised as a request for declaratory relief. "[F]ederal courts have no general power to issue writs of mandamus to direct state courts and their judicial officers in the performance of their duties where mandamus is the only relief sought." *Lamar v. 118th Judicial Dist. Court of Tex.*, 440 F.2d 383, 384 (5th Cir. 1971). However, federal judges have the power to provide declaratory and injunctive relief against state judicial officers and these remedies are unequivocally available via § 1983. *See* 42 U.S.C. § 1983 ("[I]n an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."); *Pulliam v. Allen*, 466

---

[3] Additionally, the Court notes that Judge Cantrell's affidavit, if it were sufficient to meet his heavy burden, does not resolve all of the issues before the Court regarding the Count One allegations. Specifically, Judge Cantrell's affidavit does not provide a standard to be applied when determining whether a defendant qualifies for alternative conditions of release, nor does it provide that defendants will have a right to representative counsel at initial bail hearings.

U.S. 522, 541-42 (1984); *Holloway v. Walker*, 765 F.2d 517, 525 (5th Cir. 1985).

Judge Cantrell claims that Plaintiffs are asking the Court to direct him in the exercise of his judicial duties, specifically to order him to change his bail procedures in specific ways. However, Plaintiffs' complaint and motion for summary judgement merely asks the Court to provide declaratory relief regarding Judge Cantrell's bail procedures.

> A writ of mandamus compels the defendant to perform a certain act. *See Mandamus*, Black's Law Dictionary (10th ed. 2014). By contrast, the declaratory judgments plaintiffs seek . . . would merely state that certain of defendant['s] practices are unconstitutional. The Supreme Court has recognized the authority of federal courts to issue such relief against state judges. *See Pulliam*, 466 U.S. at 526 (affirming attorneys' fees award in case where district court declared magistrate's practice of "require[ing] bond for nonincarcerable offenses . . . to be a violation of due process and equal protection and enjoined it"). Thus, the Court rejects defendant['s] argument that plaintiffs' claims for declaratory relief are in fact requests for a writ of mandamus.

*Cain*, 281 F. Supp. 3d at 645-46 (footnotes omitted). Because here the alleged acts were omissions taken in Judge Cantrell's judicial capacity, this Court has authority under § 1983.

### iii. Declaratory Judgment Act

Judge Cantrell further argues that it would be inappropriate for the Court to grant a declaratory judgment because the ruling would be merely advisory. The Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)). As an initial step in a declaratory judgment suit, the Court must determine "whether the declaratory action is justiciable." *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 387 (5th Cir. 2003). Defendant argues that the Count One claims are not justiciable because there is no "actual controversy." However, the Court has already found that Plaintiffs' claims are not moot. Accordingly, the Court may consider Plaintiffs' claims for declaratory relief.

### iv. *Brillhart-Wilton* Abstention

Finally, Judge Cantrell argues that the Court should abstain from deciding this case under the *Brillhart-Wilton* doctrine. Judge Cantrell argues that while the Declaratory Judgment Act grants federal courts discretion, the Court should decline to exercise this discretion. However, the cases cited by Judge Cantrell narrowly apply to situations where a federal court sitting in diversity is asked to grant declaratory judgment on a state law matter. *Wilton*, 515 U.S. at 280, 290; *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 493 (1942). Additionally, the Court has already considered and rejected Defendant's previous abstention arguments under the *Younger* doctrine. R. Doc. 44 at 6-8.

Accordingly, this analysis is inapplicable to the matter at hand. Furthermore, even if this analysis were applicable, the Fifth Circuit reasoning under *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585 (5th Cir. 1994), and *Sherwin-Williams Co. v. Holmes Cty.*, leads the Court away from abstention. In *Brillhart* the Court was concerned with whether a federal suit "can be better settled in the state court." 316 U.S. at 495. The Fifth Circuit employs seven nonexclusive factors for this purpose, which it first fashioned in *St. Paul Ins. Co. v. Trejo*.[4] These factors are:

> 1) Whether there is a pending state action in which all of the matters in controversy may be fully litigated, 2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant, 3) whether the plaintiff engaged in forum shopping in bringing the suit, 4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist, 5) whether the federal court is a convenient forum for the parties and witnesses, . . . 6) whether retaining the lawsuit in federal court would serve the purposes of judicial economy, and [7)] whether the federal court is being called on to construe a state judicial decree . . . .

*Trejo*, 39 F.3d at 590–91 (internal citations omitted). The Fifth Circuit has since updated its *Trejo* analysis to include: 1)"[t]he presence of federal law questions, [2)] their relationship to

---

[4] *Trejo* was decided prior to the Supreme Court's decision in *Wilton*. However, the Fifth Circuit continues to apply the *Trejo* factors with some additional and/or clarified considerations laid out in *Sherwin-Williams*.

10

state law questions, [3)] the ability of the federal court to resolve state law issues, and [4)]the ability of a state court to resolve the federal law issues." *Sherwin-Williams*, 343 F.3d at 396. "'The presence of federal law issues must always be a major consideration weighing against surrender' of federal jurisdiction." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983)). "The presence of federal law issues is especially important when there is no pending state court proceeding to which the federal district court can defer." *Id.*

Here, the issue before the Court is a federal law issue and there are no pending state court proceedings to consider. Plaintiffs have filed a § 1983 claim requesting declaratory relief recognizing their Constitutional rights. None of the above factors apply to this situation or suggest that this suit would be "better settled in state court."

Accordingly, the Court finds that the matters before it are justiciable and finds no reason to abstain from ruling. The Court now moves to a consideration of the Plaintiffs' substantive arguments seeking summary judgment.

### C.  Count One: Judge Cantrell's Bail Procedures

In Count One, Plaintiffs' main argument is that Judge Cantrell's bail procedures violate their constitutional rights because he imprisons criminal defendants solely based on their inability to pay the set bail. Plaintiffs specifically challenge Defendant's practice of setting bail without considering alternative conditions of release or ability to pay.

The facts regarding Judge Cantrell's bail procedures are undisputed. R. Docs. 121-6, 121-7. Judge Cantrell agrees that the following are standard practices for setting bail in his court:

- Introduction and overview of bail setting process.

- Qualification of defendants for public defender services, including questions regarding employment, income, and dependents.

- Time for defendants to meet with their attorneys.

- Judge Cantrell uses the background information provided by the public defender to determine the conditions of release or detention; "he does not ask additional questions."

- Judge "Cantrell has told public defenders that he would hold them in contempt when they have attempted to argue for lower bond amounts or RORs for their clients."

- Judge "Cantrell does not determine whether the financial condition of release that he imposes will result in pretrial detention."

R. Doc. 121-7 at 3-6.

It is clear that under these procedures Judge Cantrell does not request much financial information from criminal defendants prior to determining the amount of their bail. Nor does he "consider or make findings concerning alternative conditions of release when he requires secured financial conditions, and does not make any findings that pretrial detention is necessary to serve any particular government interest if a secured financial condition will result in detention." R. Doc. 121-7 at 6-7. Transcript evidence in the record confirms these facts. R. Docs. 121-7. Plaintiffs in this case were imprisoned prior to trial because they were unable to pay the set bail. Transcripts from their bail hearings demonstrate that Judge Cantrell did not inquire regarding their ability to post bail, nor did he provide reasoning for his rejection of alternative conditions of release.

As an example, Ms. Mishana Johnson was detained prior to trial on a charge of simple battery. R. Doc. 121-7 at 4. Judge Cantrell appointed a public defender to represent Ms. Johnson after learning that she did not have counsel and worked at McDonald's. R. Doc. 121-7 at 4. Her appointed counsel requested $1000 bail based on employment status and lack of risk factors. R. Doc. 121-7 at 4. Judge Cantrell set bail at $5000 without inquiry into Ms. Johnson's ability to pay and informed the public defender that he does not set bail lower than $2500. R. Doc. 121-7 at 5. Judge Cantrell later reprimanded another public defender for requesting release on recognizance ("ROR") or a $1000 bond. R. Doc. 121-7 at 5. The attorney argued that his client

was employed in a low-wage job and was a college student. R. Doc. 121-7 at 5. Judge Cantrell again set a $5000 bond without inquiry into the defendant's ability to pay or providing reasoning for his rejection of alternative conditions of release. R. Doc. 121-7 at 5.

More disturbing is the colloquy regarding bail set for Ms. Ashley Jackson on June 12, 2017. R. Doc. 121-7 at 5. Judge Cantrell had agreed to an ROR for this defendant until he realized that her listed address was a homeless shelter. R. Doc. 121-7 at 5. Subsequently, stating his concerns regarding the court's ability to contact Ms. Jackson, he set a secured $2500 bond. R. Doc. 121-7 at 5. After argument with defense counsel, Judge Cantrell stated that he was "not punishing [the defendant] for being poor [but that he was] punishing her because [the court could] not get in touch with her." R. Doc. 121-7 at 6.

This evidence suggests that Judge Cantrell regularly sets bail without considering the defendant's ability pay or qualification for alternative conditions of release and that these practices regularly result in pretrial detention based on inability to pay bail. Judge Cantrell has not argued that these descriptions of his practices are inaccurate and has made no substantive constitutional arguments in defense of these practices.

Plaintiffs argue that these practices violate their due process and equal protection rights under the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment provides that "[n]o state . . . shall deprive any person of life, liberty, or property without due process of law . . . ." U.S. Const. Amend. XIV. It protects individuals against two types of government action. "Substantive Due Process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937). "Procedural Due Process" ensures that government action depriving a person of life, liberty, or property is implemented in a fair manner. *Mathews v. Eldridge*, 424

U.S. 319, 335 (1976).

> Although "[d]ue process and equal protection principles converge" in cases involving the criminal justice system's treatment of indigent individuals, *Bearden v. Georgia*, 461 U.S. 660, 665 (1983), plaintiffs' argument sounds in procedural due process. Thus, the familiar framework set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976), applies. *See Turner v. Rogers*, 564 U.S. 431, 444–45 (2011) (applying *Mathews v. Eldridge* to civil contempt proceedings).

*Cain*, 281 F. Supp. 3d at 649.

"[S]tandard analysis under [the Due Process Clause] proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Here, Plaintiffs successfully assert that they have been deprived of a liberty interest based on "the well-established principle that an indigent criminal defendant may not be imprisoned solely because of her indigence." *Cain*, 281 F. Supp. 3d at 649 (citing *Tate v. Short*, 401 U.S. 395, 398 (1971); *United States v. Voda*, 994 F.2d 149, 154 n.13 (5th Cir. 1993)). Additionally, Plaintiffs have been deprived of their fundamental right to pretrial liberty. *United States v. Salerno*, 481 U.S. 739, 750 (1987); *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Jones v. United States*, 463 U.S. 354, 361 (1983) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)) ("It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'").

Under *Mathews*, courts consider three factors to identify the requirements of procedural due process when the state endeavors to deprive someone of these rights:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the

14

> function involved and the fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail.

424 U.S. at 335. The Supreme Court has discussed the types of procedural safeguards required to

authorize pretrial detention under the Bail Reform Act. *Salerno*, 481 U.S. at 751-52 (finding that

the procedures under the Bail Reform Act were "specifically designed to further the accuracy of

th[e] determination" of "the likelihood of future dangerousness" and did not violate due process).

Among the valuable procedural safeguards noted in *Salerno* were "right to counsel at the

detention hearing"; the opportunity to testify, present evidence, and cross-examine witnesses;

standards for the judicial officer "determining the appropriateness of detention"; government

burden of clear and convincing evidence; and requirement of findings of fact and reasons for

detention from the judicial officer. *Id.*

      The Supreme Court has also articulated additional procedural safeguards in several

different contexts including pretrial and post-conviction detention.[5] In *Bearden v. Georgia*, the

Supreme Court held that "a sentencing court can[not] revoke a defendant's probation for failure

to pay the imposed fine and restitution, absent evidence and findings that the defendant was

somehow responsible for the failure or that alternative forms of punishment were inadequate."

461 U.S. 660, 665, 673-74 (1983). There, the state court had imprisoned Bearden for his inability

to pay a fine but had not asked why he was unable to pay or considered other alternative means

of enforcing the fine. *Id.* at 674. The Court reasoned that for the state court to simply convert the

fine into a prison sentence without "inquir[ing] into the reasons for the failure to pay" or finding

that "alternate measures [we]re not adequate to meet the State's interests . . . would deprive

[Bearden] of his . . . freedom simply because, through no fault of his, he [could not] pay the

---

[5] This Court finds that the post-conviction detention cases, while not directly on point, are highly relevant because
the liberty interests of presumptively innocent, pretrial detainees cannot be less than, and are generally considered
greater than, those of convicted defendants.

fine." *Id.* at 672-73.

Moreover, in *Turner v. Rogers*, the Supreme Court held that court-appointed counsel was not required in a civil contempt proceeding if sufficient alternative procedures were provided "equivalent to . . . adequate notice of the importance of ability to pay, fair opportunity to present, and to dispute, relevant information, and court findings." 564 U.S. 431, 448 (2011). There, the Court reasoned that "[g]iven the importance of the [liberty] interest at stake, it is obviously important to assure accurate decisionmaking in respect to the key 'ability to pay' question." *Id.* at 445.

While there are clear differences between the facts of these cases and the facts at issue here, what is manifest and pertinent is the Supreme Court's emphasis on the due process requirements of an informed inquiry into the ability to pay and findings on the record regarding that ability prior to detention based on failure to pay. Accordingly, the Court finds that these cases are useful here because Plaintiffs have been subjected to pretrial imprisonment, as a result of their inability to pay a court ordered sum.

With the principles of *Salerno*, *Bearden*, and *Turner* in mind, the Court applies the *Mathews* factors to the present facts.

> First, plaintiffs' interest in securing their "freedom 'from bodily restraint[ ]' lies 'at the core of the liberty protected by the Due Process Clause.'" *Turner*, 564 U.S. at 445 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). Plaintiffs' liberty interest weighs heavily in favor of procedural safeguards provided before imprisonment.

*Cain*, 281 F. Supp. 3d at 651.

"Second, the risk of erroneous deprivation without an inquiry into ability to pay is high." *Id.* The record suggests that many criminal defendants, including Named Plaintiffs, have been imprisoned solely because they are unable to pay the bail amount set by Judge Cantrell. These are criminal defendants who have been found to be indigent for the purpose of appointing

counsel. Accordingly, the inquiry into the ability to pay "must involve at least notice and opportunity to be heard, [and express findings in the record] as suggested by *Turner*; an ability-to-pay inquiry without these basic procedural protections would likely be ineffective." *Id.*

Third, Judge Cantrell has not suggested any government interest[6] that would prevent or discourage an inquiry into the ability to pay. Rather, he seems to agree that it is appropriate to consider "[t]he ability of the defendant to give bail." R. Doc. 120-1 at 2. However, this simple consideration is inadequate under the principles laid out by the Supreme Court. *Bearden* requires that this inquiry include court consideration of the reasons why a criminal defendant cannot pay and of alternative measures prior to imprisonment. 461 U.S. at 672; *see Cain*, 281 F. Supp. 3d at 652.

Here, it is clear that Judge Cantrell did not conduct an inquiry into ability to pay or include satisfactory procedural safeguards to that inquiry when setting bail. To satisfy the Due Process principles articulated by Supreme Court precedent, Judge Cantrell must conduct an inquiry into criminal defendants' ability to pay prior to pretrial detention. "This inquiry must involve certain procedural safeguards, especially notice to the individual of the importance of ability to pay and an opportunity to be heard on the issue. If an individual is unable to pay, then [he] must consider alternative measures before imprisoning the individual." *Cain*, 281 F. Supp. 3d at 652.

Plaintiffs suggest that due process requires additional procedures in order to "ensure the accuracy of [a] finding that pretrial . . . detention is necessary." R. Doc. 116-1 at 14. Plaintiffs cite *Salerno* and the safeguards provided under the Bail Reform Act as the standard for these additional procedural safeguards because they provide confidence that a sufficient inquiry into

---

[6] Defendant has not made any constitutional arguments regarding the substance of Plaintiffs' Count One claims.

ability to pay is conducted prior to pretrial detention. In *Salerno*, the Court noted that the Bail Reform Act is "narrowly focuse[d] on individuals who have been arrested for a specific category of extremely serious offenses." 481 U.S. at 750. Even with this heightened government interest, "[i]n a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.* The Court then praised other procedural safeguards found to be sufficient under Due Process including: findings of fact, statements of reasons for decisions, and the right to counsel." *Id.* at 750-51; *see also Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973) (listing the minimum requirements of due process when revoking probation). These procedures are required for defendants charged with committing serious offenses. How much more important are these safeguards when considering pretrial detention for criminal defendants who may not be accused of committing extremely serious offenses?

First, Plaintiff suggests that Due Process requires proof under the clear and convincing standard "that pretrial detention is necessary to mitigate either a risk of flight or a danger to the community." R. Doc. 116-1 at 16. Beginning with *Addington v. Texas*, 441 U.S. 418 (1979), the Supreme Court has held that, when scrutinized under procedural due process criterion, deprivation of liberty requires a heightened standard. There, when considering the government's interest in "protect[ing] the community from the dangerous tendencies of some who are mentally ill," the Court reasoned that the clear and convincing standard struck an appropriate balance between scrupulous protection of individual liberty interests and the government interest in public safety. *Id.* at 424, 426.

In cases where physical liberty is at stake in all kinds of situations, the Court consistently applies the clear and convincing standard. *Foucha*, 504 U.S. at 82; *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 282-83 (1990); *Santosky v. Kramer*, 455 U.S. 745, 756

(1982); *Addington*, 441 U.S. at 433; *see also Woodby v. INS*, 385 U.S. 276, 286 (1966);

*Schneiderman v. United States*, 320 U.S. 118, 123 (1943). While this Court has not found a case

requiring the clear and convincing standard in the particular circumstances of this case,[7]

determining pretrial detention based specifically on risk of flight, the Court is convinced of the

vital importance of the individual's interest in pretrial liberty recognized by the Supreme Court.

In a *Mathews* analysis of the balance required by Due Process of the private liberty interest and

interest of the government in ensuring that a criminal defendant appears in court, the Court

agrees with the views expressed in the concurring opinion in *United States v. Motamedi*, 767

F.2d 1403, 1409 (9th Cir. 1985) (Boochever, J., concurring in part and dissenting in part).[8]

> [T]he consequences to the defendant from an erroneous pretrial detention are certain and grave. The potential harm to society, although also significant, is speculative, because pretrial detention is based on the possibility, rather than the certainty, that a particular defendant will fail to appear. Moreover, society's interest in increasing the probability of detention is undercut by the fact that it has no interest in erroneously detaining a defendant who can give reasonable assurances that he will appear. I conclude therefore that the injury to the individual from an erroneous decision is greater than the potential harm to society, and that under *Addington* due process requires that society bear a greater portion of the risk of error: the government must prove the facts supporting a finding of flight risk by clear and convincing evidence.

*Id.* at 1415.

Second, Plaintiffs suggest that arrestees must be represented by counsel. R. Doc. 116-1 at

24. The importance of the right to counsel is evident from its inclusion in the Bill of Rights. The

Sixth Amendment requires that the government provide counsel for those who cannot afford it at

"critical stages" of criminal proceedings. *Bell v. Cone*, 535 U.S. 685, 695-96 (2002). The

---

[7] Case law considering the standard required under the Bail Reform Act alone has held that the preponderance of the evidence standard is sufficient. *See e.g.*, *United States v. McConnell*, 842 F.2d 105 (5th Cir. 1988). However, these cases did not consider the burden of proof require by the Due Process Clause of the Fourteenth Amendment. *See e.g.*, *McConnell*, 842 F.2d 105; *United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985).

[8] In *United States v. Motamedi*, the Ninth Circuit was confronted only with the question of the proper standard required by the Bail Reform Act. The Court finds Judge Boochever's reasoning persuasive when conducting an analysis of the standard required by the Constitution.

Supreme Court has held that "critical stages" are those that "h[o]ld significant consequences for the accused." *Id.* at 696; *Coleman v. Alabama*, 399 U.S. 1, 10 (1970) (holding that a preliminary bail hearing is a "critical stage . . . at which the accused is . . . entitled to [counsel]"). There is no question that the issue of pretrial detention is an issue of significant consequence for the accused.

Under a *Mathews* analysis, the Court finds that without representative counsel the risk of erroneous pretrial detention is high. Preliminary hearings can be complex and difficult to navigate for lay individuals and many, following arrest, lack access to other resources that would allow them to present their best case. Considering the already established vital importance of pretrial liberty, assistance of counsel is of the utmost value at a bail hearing.

Judge Cantrell does not argue this point. In fact, the record shows that public defenders are regularly provided for those individuals found to be indigent at their initial appearance before Judge Cantrell. The Court commends this practice and encourages its continuance. Beyond this encouragement, the Court finds that the right to counsel at a bail hearing to determine pretrial detention is also required by due process. The interests of the government are mixed regarding provision of counsel at this stage. It is certainly a financial burden on the state to provide attorneys for the indigent. However, this burden is outweighed not only by the individual's great interest in the accuracy of the outcome of the hearing, but also by the government's interest in that accuracy and the financial burden that may be lifted by releasing those arrestees who do not require pretrial detention. Accordingly, the *Mathews* test demonstrates that due process requires representative counsel at pretrial detention hearings.

As discussed above, the record indicates that Judge Cantrell's bail procedures have not provided notice of the importance of the issue of the criminal defendant's ability to pay, inquiry into the ability to pay, findings on the record regarding ability to pay and consideration of alternative conditions of release, or application of a legal standard in the determination of the

necessity of pretrial detention. Accordingly, these procedures violate Plaintiffs' procedural due process rights; Plaintiffs' are entitled to summary judgment on Count One and it is appropriate to grant Plaintiffs' motion for declaratory judgment.

The Court commends Judge Cantrell's expressed willingness to mend the bail procedures in his court to comply with due process requirements. R. Doc. 120-1. As a summary of the above discussed *Mathews* analysis, the Court finds that in the context of hearings to determine pretrial detention Due Process requires:

> 1) an inquiry into the arrestee's ability to pay, including notice of the importance of this issue and the ability to be heard on this issue;
>
> 2) consideration of alternative conditions of release, including findings on the record applying the clear and convincing standard and explaining why an arrestee does not qualify for alternative conditions of release; and
>
> 3) representative counsel.

### D. Count Two: Conflict of Interest

In Count Two, Plaintiffs argue that Judge Cantrell has an unconstitutional conflict of interest that violates due process when he sets bail. Plaintiffs challenge Judge Cantrell's multipurpose role in determining their ability to pay bail, the amount of bail upon which pretrial release is conditioned, and managing the Judicial Expense Fund, a portion of which comes from fees levied on commercial surety bonds. Plaintiffs argue that Judge Cantrell's management role over this fund creates an unconstitutional conflict of interest that deprives them of their right to a neutral fact finder in pretrial detention hearings.

### i. The Judicial Expense Fund

Louisiana Revised Statute 13:1381.4 sets up the Judicial Expense Fund ("the Fund") for the Orleans Parish Criminal District Court ("OPCDC"). The Fund receives revenue from fines,

fees, costs, and forfeitures imposed by the OPCDC. *See* La. Rev. Stat. § 13:1381.4.

Approximately $1 million per year in revenue comes from fees levied on commercial surety

bonds, representing roughly 20-25% of the total Fund in a given year. R. Doc. 121-7 at 9. The

fund is controlled by the Judges of the OPCDC and "may be used for any purpose connected

with, incidental to, or related to the proper administration or function of the court or the office of

the judges . . . ." La. Rev. Stat. § 13:1381.4(C). However, the Fund may not be used to pay any

judge's salary. *Id.* § 13.1381.4(D). Generally, the Fund is used to finance court operations

including, but not limited to, staff salaries and benefits, conferences and legal education,

ceremonies, office supplies, law books, jury expenses, and other services. R. Doc. 121-7 at 8.

### ii. Legal Standards

As discussed by the Court in *Cain v. City of New Orleans*, the unbiased judge or neutral

fact finder has long been considered "essential to due process." *Pub. Citizen, Inc. v. Bomer*, 274

F.3d 212, 217 (5th Cir. 2001) (quoting *Johnson v. Mississippi*, 403 U.S. 212, 216 (1971)). While

disqualification of a judge is not common, the Supreme Court has held that when a judge has

financial interests in the matter before him due process is violated. In *Tumey v. Ohio*, the

Supreme Court "held that the mayor, acting as judge, was disqualified from deciding Tumey's

case 'both because of his direct pecuniary interest in the outcome, and because of his official

motive to convict and to graduate the fine to help the financial needs of the village.'" *Cain*, 281

F. Supp. 3d at 655 (quoting *Tumey v. Ohio*, 273 U.S. 510, 535 (1927)). There, the mayor acted as

judge in courts that levied fines, some of which went to village funds. *Tumey*, 273 U.S. at 521-

22. These funds covered some court expenses as well as some fees paid to the mayor himself. *Id.*

at 522.

Later, in *Ward v. Village of Monroeville*, the Court held that a mayor's court violated due

process when it financed a "major part" of the city funds that were also managed by the mayor.

409 U.S. 57, 58, 60 (1972). There, the Court reasoned that the principle articulated in *Tumey* did not rely on the mayor's personal interest in the funds. *Id.* at 60. Rather, the Court articulated the following test: "whether the . . . situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused.'" *Id.* at 60 (quoting *Tumey*, 273 U.S. at 532).

More recently, the Court has clarified that finding a conflict of interest in violation of due process "do[es] not require proof of actual bias." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009). Rather, when determining whether the Due Process Clause requires judicial recusal due to a conflict of interest, the correct question is "whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" *Id.* at 883-84 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

The Fifth Circuit applied these principles in *Brown v. Vance*, 637 F.2d 272, 274, 282 (5th Cir. 1981), holding that a fee system that compensated justices of the peace based on volume of cases filed was unconstitutional. There, the Court reasoned that the Supreme Court's concern in *Tumey* and *Ward*

> was not . . . the probity of an individual judge or perhaps even, of the great majority of judges . . . rather [it was] in the inherent defect in the legislative framework arising from the vulnerability of the average man-as the system works in practice and as it appears to defendants and to the public.

*Id.* at 284. Accordingly, the Court found that the undeniable opportunity and "possible temptation to the average man as a judge to forget the burden of proof required" created by the system was sufficient to "deprive[] criminal defendants of their due process right to a trial before

23

an impartial tribunal." *Id.* at 282 (quoting *Tumey*, 273 U.S. at 532).

Most recently, this Court applied this line of cases holding that collection of costs and fees by judges in Orleans Criminal District Court who also administer those monies as part of the Judicial Expense Fund had an "institutional incentive[ that] create[d] an impermissible conflict of interest when they determine, or are supposed to determine, plaintiffs' ability to pay fines and fees." *Cain*, 281 F. Supp. 3d at 659. The *Cain* case dealt with the same Judicial Expense Fund at issue in this case and a different source of revenue also determined by judges. There, the relevant facts included the above discussed management of the Judicial Expense Fund by the judges and those same judges determination of ability to pay the fines and fees going to the Fund. *Id.* at 654.

The Court in *Cain* reasoned that "[b]y no fault of their own, the Judges' 'executive responsibilities for [court] finances may make [them] partisan to maintain the high level of contribution,' . . . from criminal defendants." *Id.* at 657 (quoting *Ward*, 409 U.S. at 60). For that reason, the Court found that the judge's "substantial" conflict of interest in adjudicating plaintiffs' ability to pay fines and fees "offend[ed] due process" "[s]o long as the Judges control and heavily rely on fines and fees revenue." *Id.* at 657-58.

### iii.  Analysis

Here, it is clear from the record that Judge Cantrell participates in the management of the Fund, sets the amount of bail, and determines arrestee's ability to pay bail. R. Doc. 121-7 at 8. As discussed above, the Fund is partially financed by fees levied on commercial surety bonds. Judges, including Judge Cantrell then use these funds to finance court operations. Approximately $1,000,000 gained from bond fees is deposited into the Fund each year.[9] This is roughly 20-25%

---

[9] The Fund gained $821,371 in bond fees in 2012, $1,062,224 in 2013, $1,026,282 in 2014, $1,008,108 in 2015, $848,089 in 2016, and $839,006 in 2017. R. Doc. 121-7 at 9.

of the Fund's total revenue in a given year.[10] R. Doc. 121-7 at 9. "This funding structure puts the Judges in the difficult position of not having sufficient funds to staff their offices unless they impose and collect sufficient [monies] from a largely indigent population of criminal defendants." *Cain*, 281 F. Supp. 3d at 655.

Judge Cantrell's participation in the management of bond fee revenue creates a conflict of interest because he is also responsible for determining whether a pretrial detainee is able to pay bail and the appropriate amount of bail. As stated above, due process requires that Judge Cantrell make an inquiry regarding an arrestee's ability to pay and consider alternative conditions of release. However, Judge Cantrell also has a financial interest in these determinations as well as the determination of the amount of bail because revenue collected as a percentage of the bail set by him is promptly sent to the Fund. *See id.* Accordingly, Judge Cantrell "ha[s] an institutional incentive to find that criminal defendants are able to pay bail" and to set higher bail amounts. *Id.*

> [Defendant Cantrell's] dual role, as [an] adjudicator who determine[s] ability to pay [and amount of bail] and as manager[] of the OPCDC budget, offer[s] a possible temptation to find that indigent criminal defendants are able to pay [bail and higher amounts of bail]. This "inherent defect in the legislative framework" arises not from the bias of any particular Judge, but "from the vulnerability of the average man—as the system works in practice and as it appears to defendants and to the public."

*Id.* (quoting *Brown*, 637 F.2d at 284).

The *Tumey* Court further reasoned that to offend due process the judicial conflict of interest must be substantial. 273 U.S. at 534 ("The minor penalties usually attaching to the ordinances of a village council, or to the misdemeanors in which the mayor may pronounce final judgment without a jury, do not involve any such addition to the revenue of the village as to

---

[10] The revenue from bond fees represented 20% of the total Fund revenue in 2012, 25.9% in 2013, 26.1% in 2014, 25.5% in 2015, 21% in 2016, and 19% in 2017. R. Doc. 121-7 at 9.

justify the fear that the mayor would be influenced in his judicial judgment by that fact.); *Cain*, 281 F. Supp. 3d at 657. "[T]he proper question is 'whether the official motive here is "strong," so that it "reasonably warrants fear of partisan influence on the judgment."'" *Id.* (quoting *Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*, 114 F.3d 840, 847 (9th Cir. 1997)).

Here, it is clear that Judge Cantrell's, as well as that of the OPCDC, institutional interest in the fees derived from commercial surety bonds is substantial. As discussed above, the percentage of the Fund derived from these fees is roughly 25% and these funds make up a considerable portion of the salaries and benefits for judicial employees. In *Cain*, the Court found that a similar percentage of the Fund was enough to make the judges' conflict of interest substantial. *Id.* at 657-58 ("Fines and fees revenue is obviously important to the Judges; fines and fees provide approximately 10% of the total OPCDC budget and one quarter of the Judicial Expense Fund.").

As explained by the Court in *Cain*, this conflict of interest is not created by Judge Cantrell, nor is it his fault. The conflict of interest is "the unfortunate result of the financing structure" and lack of sufficient funding from the state and local governments for the criminal justice system. *Id.* at 658. However, the source of the conflict does not change the fact that as long as Judge Cantrell participates in the control of bond fee revenue and the OPCDC relies on it as a substantial source of funding, Judge Cantrell's determination of Plaintiffs' ability to pay bail and the amount of that bail is in violation of due process. *See id.*

Defendant makes several arguments that his dual role in setting bail and administering the Fund do not offend due process requirements. The Court will consider each in turn.

First, Judge Cantrell argues that the Fund system does not create a conflict of interest because if the OPCDC needs additional funds it can request them from the state legislature or local parish government. R. Doc. 120 at 9. The Court approaches this claim with some

incredulity. Given the substantial percentage of the Fund coming from bond fees, the Court finds it implausible that these revenues would be easily replaced by solicitation of state and local officials. Furthermore, OPCDC officials themselves have noted the significance of this amount of revenue and its sources to the Fund. *See Cain*, 281 F. Supp. 3d at 658.[11]

Second, Judge Cantrell argues that the revenues in the Fund are publically audited and used appropriately. The Court finds this fact irrelevant to the issues before it as Plaintiffs are not arguing that the use of the revenues violates their constitutional rights, but rather that the determination of those revenues and control over them by the same individual is the problem.

Third, Judge Cantrell argues that he is not subjected to a quota, receives no rewards based on amount of revenue collected, and has no personal interest in the Fund. The Court finds that it is not necessary for Judge Cantrell to have a quota, punishment, or reward associated with the Fund in order to have a conflict of interest. The significance of these funds for the payment of personnel salaries and other administrative needs, approximately $250,000 per chambers, is sufficient incentive to act as a "possible temptation" to the "average man." Additionally, "[t]hat [Judge Cantrell] ha[s] an institutional, rather than direct and individual, interest in maximizing [bond fee] revenue is immaterial." *Cain*, 281 F. Supp. 3d at 656. "*Ward* itself involved a mayor who had no direct, personal interest in traffic fine revenue; his interest related solely to his 'executive responsibilities for village finances.' 409 U.S. at 60. Likewise, [Judge Cantrell's] interest in [bond fee] revenue is related to [his] executive responsibilities for OPCDC finances." *Id.* at 656-57.

Fourth, Judge Cantrell argues that all courts are partially funded by fees from criminal

---

[11] The Court also notes that the Affidavit testimony submitted to support this argument is the same testimony provided to Judge Vance in the *Cain* case. R. Doc. 120-2. Judge Vance did not find the argument negated her finding that the "OPCDC depends heavily on fines and fees revenue" which also makes up approximately 25% of the Fund. *Cain*, 281 F. Supp. 3d at 658.

defendants and if this funding offends due process then no courts will be functional. Defendant misses the point here because the problem is not specifically with the fact that the court is partially funded by fees from criminal defendants and those that utilize the court system. Rather the problem lies with the inherent temptation and conflict of interest when the same official is determining ability to pay bail, and the amount of that bail, and also managing the funds collected from fees on that bail.

Fifth, Judge Cantrell argues that Plaintiffs cannot overcome the "presumption of honesty and integrity of judges." R. Doc. 120 at 13 (citing *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052-53 (5th Cir. 1997)). However, in *Brown v. Vance*, when reviewing the district court's use of this standard, the Fifth Circuit found that the district court had erred. 637 F.2d at 283.

> There is no language in *Tumey* or *Ward* qualifying the "possible temptation" standard by the necessity of overcoming the presumption of probity in favor of adjudicators. That added burden comes from *Withrow v. Larkin*, 421 U.S. 35, upon which the district court and the defendant strongly relied. But the question in *Withrow* was whether a board of physicians could exercise both investigative and adjudicative functions.

*Id.* Likewise, the case cited by Judge Cantrell involved the potential bias of a school board rather than a judge. *Valley*, 118 F.3d at 1049. Accordingly, the proper standard has been stated above, that the interest under *Tumey* and *Ward* is not the actual bias or integrity of an individual judge, but rather "the vulnerability of the average man-as the system works in practice and as it appears to defendants and to the public [and] the possibility that judges will fail to hold 'the balance nice, clear and true.'" *Brown*, 637 F.2d at 284. Furthermore, it is not only important that justice be done; it is equally important that justice appear to be done. The appearance of justice is vital to perpetuation of the rule of law, a concept upon which our society is based.

Finally, Judge Cantrell raises *Broussard v. Parish of Orleans* arguing that the bail bond statutes do not create an unconstitutional bias. The Court has previously addressed the relevance

of *Broussard* in the proper party defendant context. R. Doc. 81 at 6. The Court again finds that *Broussard* is not relevant to the issue of judicial conflict of interest in this case. In *Broussard* the plaintiffs challenged the constitutionality of Louisiana bail statutes rather than alleging bias of individual judicial officers. 318 F.3d 644, 647 (5th Cir. 2003). There, the Fifth Circuit affirmed the district court finding that *Tumey* and *Ward* did not apply because the defendants, sheriffs, were not exercising a judicial function. *Id.* at 662. In contrast, Judge Cantrell does exercise a judicial function when he, sitting as Magistrate Judge, determines Plaintiffs' ability to pay bail and the amount of that bail. Therefore, it is appropriate to apply the *Tumey* and *Ward* tests here when determining whether there is an unconstitutional conflict of interest.

The Court finds none of these arguments persuasive, and finds that Plaintiffs have succeeded in demonstrating that Judge Cantrell's participation in the management of the Fund in conjunction with his determination of Plaintiffs' ability to pay bail and the amount of that bail is a substantial conflict of interest that produces a "possible temptation . . . not to hold the balance nice, clear, and true between the state and the accused." *Ward*, 409 U.S. at 60 (quoting *Tumey*, 273 U.S. at 532). Accordingly, Plaintiffs are entitled to summary judgment on Count Two and are entitled to a declaratory judgment that Judge Cantrell's institutional incentives create a substantial and unconstitutional conflict of interest when he determines their ability to pay bail and sets the amount of that bail.

## IV.    CONCLUSION

As articulated above,

**IT IS ORDERED** that Plaintiffs' motion for summary judgment, R. Doc. 116, is hereby **GRANTED** and the Court provides declaratory relief as laid out above.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment, R. Doc. 121, is hereby **DENIED**.

New Orleans, Louisiana, this 6th day of August, 2018.

_____
UNITED STATES DISTRICT JUDGE