IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
August 29, 2019
Lyle W. Cayce
Clerk

No. 18-30954

ADRIAN CALISTE, individually and on behalf of all others similarly situated; BRIAN GISCLAIR, individually and on behalf of all others similarly situated,

      Plaintiffs - Appellees

v.

HARRY E. CANTRELL, Magistrate Judge of Orleans Parish Criminal District Court,

      Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, JONES, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

"No man can be judge in his own case." Edward Coke, INSTITUTES OF THE LAWS OF ENGLAND, § 212, 141 (1628). That centuries-old maxim comes from Lord Coke's ruling that a judge could not be paid with the fines he imposed. *Dr. Bonham's Case*, 8 Co. Rep. 107a, 118a, 77 Eng. Rep. 638, 652 (C.P. 1610). Almost a century ago, the Supreme Court recognized that principle as part of the due process requirement of an impartial tribunal. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).

This case does not involve a judge who receives money based on the decisions he makes. But the magistrate in the Orleans Parish Criminal

Case: 18-30954    Document: 00515152183    Page: 2    Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN   Document 159-2   Filed 10/24/19   Page 2 of 14

No. 18-30954

District Court receives something almost as important: funding for various judicial expenses, most notably money to help pay for court reporters, judicial secretaries, and law clerks. What does this court funding depend on? The bail decisions the magistrate makes that determine whether a defendant obtains pretrial release. When a defendant has to buy a commercial surety bond, a portion of the bond's value goes to a fund for judges' expenses. So the more often the magistrate requires a secured money bond as a condition of release, the more money the court has to cover expenses. And the magistrate is a member of the committee that allocates those funds.

Arrestees argue that the magistrate's dual role—generator and administrator of court fees—creates a conflict of interest when the judge sets their bail. We decide whether this dual role violates due process.

I.

Judge Henry Cantrell is the magistrate for the Orleans Parish Criminal District Court. He presides over the initial appearances of all defendants in the parish, which encompasses New Orleans. At those hearings, there are typically 100–150 a week, Judge Cantrell appoints counsel for indigent defendants and sets conditions of pretrial release. One option for ensuring a defendant's appearance is requiring a secured money bond. Just about every defendant who meets that financial condition does so by purchasing a bond from a commercial surety, as that requires paying only a fraction of the bond amount.

When a defendant buys a commercial bail bond, the Criminal District Court makes money. Under Louisiana law, 1.8% of a commercial surety bond's value is deposited in the court's Judicial Expense Fund.[1] *See* LA. R.S.

---

[1] Other government offices also benefit. The Sherriff's Office, District Attorney's Office, and Office of the Indigent Defender each receive 0.4% of the bond. *See* LA. R.S. §§ 22:822(A)(2), (B)(3), 13:1381.5(B)(2)(b–d).

2

Case: 18-30954   Document: 00515152183   Page: 3   Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN   Document 159-2   Filed 10/24/19   Page 3 of 14

No. 18-30954

§§ 22:822(A)(2), (B)(3), 13:1381.5(B)(2)(a). That fund does not pay judges' salaries, but it pays salaries of staff, including secretaries, law clerks, and court reporters. It also pays for office supplies, travel, and other costs. The covered expenses are substantial, totaling more than a quarter million dollars per judge in recent years. The bond fees are a major funding source for the Judicial Expense Fund, contributing between 20–25% of the amount spent in recent years.[2] All 13 judges of the district court, including Judge Cantrell, administer the fund.

Judge Cantrell requires a secured money bond for about half of the arrestees. So it was not unusual when he imposed that condition for both Adrian Caliste and Brian Gisclair when they appeared before him on misdemeanor arrests. Nor was it uncommon when Judge Cantrell did not make findings about their ability to pay or determine if nonfinancial conditions could secure their appearance. It took over two weeks for Caliste to come up with the money to buy a bail bond, which cost about 12–13% of the $5,000 amount the court set (Caliste had two charges and bail was set at $2,500 per offense). Gisclair was never able to come up with the money and stayed in jail for over a month before being released.

While they were in custody, Caliste and Gisclair filed this federal civil rights lawsuit against Judge Cantrell. They sued on their own behalf and to represent a class of all arrestees "who are now before or who will come before"

---

[2] In another case, plaintiffs argued that a separate conflict of interest existed because of the court fees and fines that also help fund the Judicial Expense Fund. That case was brought against all the judges of the Orleans Criminal District Court, contending that their "administrative supervision over [the Fund], while simultaneously overseeing the collection of fines and fees making up a substantial portion of [the Fund], crosses the constitutional line." *Cain v. White*, -- F.3d --, 2019 WL 3982560 (Aug. 23., 2019). A different panel of this court recently held that this arrangement for fees and fines violated due process. *See id.*

3

No. 18-30954

Judge Cantrell for pretrial release determinations and who cannot afford the financial conditions imposed.[3] *See* FED. R. CIV. P. 23(b)(2).

The lawsuit challenges two aspects of Judge Cantrell's bail practices. First, the complaint alleges that he was violating the Due Process and Equal Protection Clauses by setting bond without inquiring into an arrestee's ability to pay or considering the adequacy of nonfinancial conditions of release. This, Plaintiffs contend, results in keeping people in jail only because of their inability to make a payment. The second allegation relates to Cantrell's "dual role as a judge determining conditions of pretrial release and as an executive in charge of managing the Court's finances." To plaintiffs, the financial incentive to require secured money bonds is a conflict of interest that deprives arrestees of their due process right to an impartial tribunal. For both claims, the plaintiffs sought only declaratory relief.

This appeal concerns only the conflict-of-interest claim. A year after the case was filed, Judge Cantrell told the district court that he had altered his bail practices to consider ability to pay and argued that this change mooted the first claim. The district court disagreed and granted a declaratory judgment on both claims. But Judge Cantrell appeals only the determination that his setting the bonds that help fund his court violates due process.

## II.

Unlike some of its legal ancestors, English common law assumed that judges could maintain impartiality in the face of most connections to a case. *See* John P. Frank, *Disqualification of Judges*, 56 YALE L.J. 605, 609 (1947). It did not follow the path of Roman or Jewish law, both of which disqualified judges for a variety of reasons. *See* THE CODE OF JUSTINIAN 3.1.14 (S.P. Scott

---

[3] Although the named plaintiffs' state criminal cases are over, class certification means the case is not moot. *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991).

4

trans., 1932) (allowing litigants to "reject judges appointed to hear a case . . . [e]ven when the judge was appointed by the Emperor, for the reason that We have set our hearts upon all suits being conducted without any suspicion of unfairness"); THE CODE OF MAIMONIDES, BOOK FOURTEEN: THE BOOK OF JUDGES, ch. 23, at 68–69 (Abraham M. Hershman, trans., Yale Univ. Press 1949) (requiring disqualification even when a party performed minor tasks for the judge such as removing a bird's feather from the judge's mantle or helping the judge get out of a boat when it reached shore). Though medieval England had those who suggested it should likewise recognize bias as a basis for recusal,[4] by Blackstone's day the country had charted a different course:

> [J]udges or justices cannot be challenged. For the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea.

3 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 361 (1768). Trust in the impartiality of judges was carried to extremes. Judges could even hear cases involving close family members. *See Brookes v. Earl of Rivers*, Hardres 503, 145 Eng. Rep. 569 (Ex. 1668) (allowing a judge to hear a case involving his brother-in-law).

But the common law view that judges were incorruptible had a notable exception—when judges might benefit financially. *See Tumey v. Ohio*, 273 U.S. 510, 525 (1927) ("There was at the common law the greatest sensitiveness over the existence of any pecuniary interest however small or infinitesimal in the justice of the peace."). Lord Coke's famous line reflected that view, as did his ruling that a judge could not issue a judgment while also taking a portion of the fine to pay his salary. *Dr. Bonham's Case*, 8 Co. Rep. 107a, 118a, 77 Eng.

---

[4] Thirteenth-century legal commentator Henry de Bracton argued that "[a] justiciary may be refused for good cause." *See* 6 Henry de Bracton, DE LEGIBUS ET CONSUETUDINIBUS ANGLIAE 248–49 (Travers Twiss, trans., 1883).

Case: 18-30954 Document: 00515152183 Page: 6 Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN Document 159-2 Filed 10/24/19 Page 6 of 14

No. 18-30954

Rep. 638, 652 (C.P. 1610). Similarly, a judge could not rule on an ejectment proceeding when he was the landlord. *See, e.g., Anonymous*, 1 Salkeld 396, 91 Eng. Rep. 343 (K.B. 1698); *see also Earl of Derby's Case*, 12 Co. Rep. 114, 77 Eng. Rep. 1390 (K.B. 1614). There was even concern that a judge's role as a citizen and a taxpayer in a town might be disqualifying, *see Between the Parishes of Great Charte and Kennington*, 2 Strange 1173, 93 Eng. Rep. 1107, 1107–08 (K.B. 1726) (quashing order of removal of pauper made by two justices of the peace because one "was an inhabitant of the parish from whence the pauper was removed"), until Parliament passed a law rejecting that notion in an early example of the "rule of necessity" that still applies to judicial recusal, *see* Frank, *supra*, at 610–11. The common law thus distinguished between "bias," which did not disqualify the judge, and "interest," which did. *Id.* at 611–12.

After Independence, American law reflected the same concerns about a judge's financial interest in a case. James Madison recited Lord Coke's maxim in the Federalist Papers. THE FEDERALIST NO. 10, at 47 (James Madison) (Clinton Rossiter ed., 1961). Justices recused themselves from early Supreme Court cases when they had a financial interest in the result. Frank, *supra*, at 615 (citing *Livingston v. Maryland Ins. Co.*, 7 Cranch (11 U.S.) 506 (1813); *Fairfax's Devisee v. Hunter's Lessee*, 7 Cranch (11 U.S.) 603 (1813); *Martin v. Hunter's Lessee*, 1 Wheat. (14 U.S.) 304 (1816)).[5] But some nineteenth century state legislatures and courts tempered the common-law rule by not requiring

---

[5] Chief Justice Marshall owned much of the land at issue in the *Hunter's Lessee* litigation. Joel Richard Paul, WITHOUT PRECEDENT: CHIEF JUSTICE JOHN MARSHALL AND HIS TIMES 335 (2018). In contrast to his recusal in those cases, he famously did not recuse in *Marbury v. Madison* even though his failure as Secretary of State to deliver Marbury's commission started that controversy. *Id.* at 243–44. Marshall's recusal decisions illustrate the common law's almost exclusive concern with financial conflicts. *See* Frank*, supra*, at 611–12 (explaining that financial interest was the only basis for disqualification in this period; "relationship" to the case did not require recusal).

Case: 18-30954    Document: 00515152183    Page: 7    Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN   Document 159-2   Filed 10/24/19   Page 7 of 14

No. 18-30954

recusal for an interest "so remote, trifling, and insignificant that it may fairly be supposed to be incapable of affecting the judgment of or influencing the conduct of an individual." *Tumey v. Ohio*, 273 U.S. 510, 531 (1927) (quoting T. Cooley, CONSTITUTIONAL LIMITATIONS 594 (7th ed. 1903)).

These principles, including the significance of the interest, inform the constitutional rules governing judge's financial conflicts. As is true for other areas of criminal procedure,[6] it was not until the increased law enforcement Prohibition brought that the Supreme Court addressed a due process challenge to a judge's financial conflicts. The first case involved a mayor's court used in Ohio villages to prosecute violations of the state Prohibition Act. *Tumey v. Ohio*, 273 U.S. 510 (1927). On this "liquor court," the mayor was the judge and could convict without a jury. *Id.* at 516–17, 521. If the mayor found the defendant guilty, some of the fine the defendant paid would go towards the mayor's "costs in each case, in addition to his regular salary." *Id.* at 519 (quoting the local ordinance). Portions of the fines the village collected would also go to the prosecutor and officers who investigated the case. *Id.* at 518–19. If the mayor found the defendant not guilty, neither he nor anyone else working for the village would make money from the case. *Id.* at 523.

Relying on the legal tradition just outlined, the Court held that the liquor court judge's interest in the outcome violated due process. *Id.* at 531–32. It did not require a showing that the mayor was favoring the prosecution; the financial incentive itself was enough:

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance

---

[6] *See, e.g.*, *Nathanson v. United* States, 290 U.S. 41, 47 (1933) (holding that search warrant requires probable cause); *Olmstead v. United States,* 277 U.S. 438, 464–66 (1928) (addressing whether wiretapping is a search); *United States v. Lanza*, 260 U.S. 377, 382 (1922) (applying "dual sovereign" principle of double jeopardy law to allow both state and federal prosecution of same bootlegging activity).

Case: 18-30954    Document: 00515152183    Page: 8    Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN    Document 159-2    Filed 10/24/19    Page 8 of 14

No. 18-30954

nice, clear, and true between the state and the accused, denies the latter due process of law.

*Id.* at 532; *see id.* at 525–26 (chronicling the rule at common law that judges not have any pecuniary interest in their rulings).

This "average man as judge" standard—focusing on the strength of the temptation rather than an actual showing of impartiality—has guided the due process inquiry ever since. Judge Cantrell tries to avoid it, arguing that *Tumey*'s "average man" standard is no longer good law. He contends later cases replaced it with an "average judge" standard that recognizes judges' greater capacity for impartiality. The supposed change comes from *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986), when the Court quoted *Tumey* but referred to "the average . . . judge," leaving out the original "man acting as" language. This argument makes a mountain out of an ellipsis. The Supreme Court never explained that it was creating a more deferential standard in using the more concise language. Its most recent conflict-of-interest opinion uses both "average judge" and "average man" without indicating a difference between the two. *See Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 878, 881 (2009). Most fundamentally, Judge Cantrell's argument that judges have a knack for impartiality—and thus that the average judge is not as tempted as the average man—ignores that the law has long rejected that presumption for a judge's financial conflicts. Frank*, supra,* at 611–12; *compare Aetna*, 475 U.S. at 820–21 (bias against insurers did not disqualify judge), *with id.* at 821–25 (involvement in similar suits against insurers disqualified judge). We see no legal difference between the two formulations the Supreme Court has used. *See Cain*, 2019 WL 3982560, at \*5–6 (rejecting the same argument Cantrell advances).

The cases applying the *Tumey* standard can be sorted into two groups. A few address one-off situations when the financial incentive is unique to the

Case: 18-30954   Document: 00515152183   Page: 9   Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN   Document 159-2   Filed 10/24/19   Page 9 of 14

No. 18-30954

facts of the case. Examples are cases when the judge had a substantially similar case pending against one of the parties, *Aetna*, 475 U.S. at 821–25, or when a party had contributed more to the judge's election campaign than all other donors combined, *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881–87 (2009). This case is not like those.

Instead, the challenge to Judge Cantrell's dual role fits into the line of cases addressing incentives that a court's structure creates in every case. *Tumey,* 273 U.S. 510; *Dugan v. Ohio*, 277 U.S. 61 (1928); *Ward v. Monroeville*, 409 U.S. 57 (1972). The incentives that most obviously violate the right to an impartial magistrate are those that, like *Tumey* and its English predecessors, put money directly into a judge's pocket. *See Tumey*, 273 U.S. at 523 (holding that the judge receiving a portion of the fines "certainly" violated due process). It also violates due process when rulings indirectly funnel money into a judge's bank account. *See Brown v. Vance*, 637 F.2d 272, 284–86 (5th Cir. 1981). We thus held unconstitutional the statutory fee system for compensating Mississippi justices of the peace because those judges' compensation depended on the number of cases filed in their courts. As a result, they were incentivized to rule for plaintiffs in civil cases and the prosecution in criminal ones to encourage more filings. *Id.* at 274. Again, it was the mere threat of impartiality that violated due process. As Judge Wisdom explained, it did not matter that "there must be many, many judges in Mississippi, as in any other state, pure in heart and resistant to the effect their actions may have on arresting officers and litigating creditors," because "the temptation exists to take a biased view that will find favor in the minds of arresting officers and litigating creditors. This vice inheres in the fee system. It is a fatal constitutional flaw." *Id.* at 276.

Unlike the *Tumey* or *Brown* judges, Judge Cantrell does not receive a penny, either directly or indirectly, from his bail decisions. But requiring a

Case: 18-30954    Document: 00515152183    Page: 10    Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN   Document 159-2   Filed 10/24/19   Page 10 of 14

No. 18-30954

secured money bond provides him with substantial nonmonetary benefits. Most significantly, money from commercial surety bond fees helps pay the judge's staff. Without support staff, a judge must spend more time performing administrative tasks. Time is money. And some important tasks cannot be done without staff. Judge Cantrell cannot simultaneously preside as judge and court reporter (he employs two). Office supplies also promote efficiency. The fees the Orleans Parish Criminal District Court receives from commercial sureties thus help fund critical pieces of a well-functioning chambers. And if an elected judge is unable to perform the duties of the job, the job may be at risk. So we do not think it makes much difference that the benefits Judge Cantrell and his colleagues receive from bail bonds are not monetary.

Having decided that the "average man as judge" standard applies and that significant nonmonetary benefits can create a conflict, we turn to the crux of the dispute: Does Judge Cantrell's dual role violate due process? In addition to *Tumey*, two other Supreme Court cases that again looked at Ohio mayors' courts flesh out when the structural temptation of a dual role creates an unconstitutional conflict. The first, decided the term after *Tumey*, considered another liquor court. *See Dugan v. State,* 277 U.S. 61 (1928). Dugan was the mayor of a small town, empowered to run a mayor's court and convict those who possessed liquor. *Id.* at 62. Unlike the *Tumey* mayor, he did not receive an additional fee for convictions; the fines went to the town's general fund which paid his fixed salary. *Id.* at 62–63. And despite the "mayor" title, Dugan was not the chief executive of the city; a city manager was. *Id* at 63. Dugan was, however, one of five members of the city commission, a legislative body with power to decide how city funds were spent, but he could not vote on his own salary. *Id.* at 62–63. The Court held that although a judge might be tempted to rule in a way that would increase fines were he also a "chief executive . . . responsible for the financial condition of the village," that was

10

Case: 18-30954    Document: 00515152183    Page: 11    Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN   Document 159-2   Filed 10/24/19   Page 11 of 14

No. 18-30954

not Dugan's situation. *Id*. at 65. His role as a nonexecutive, and as only one of five votes on financial policy, meant any benefit he received from the fines he levied was "remote." *Id*.

Forty-five years later, an Ohio mayor's court returned to the Supreme Court's docket. *See Ward v. Village of Monroeville*, 409 U.S. 57 (1972). With Prohibition long ended, this mayor's court assessed traffic fines. *Id*. The traffic court provided about 40% of the village's revenue. *Id*. at 58. That created a constitutional problem because, unlike the *Dugan* mayor, the *Ward* mayor was the city's chief executive, tasked with "general overall supervision of village affairs." *Id*. The "temptation" resulting from this executive responsibility for village finances created an unconstitutional conflict when he presided over the fine-generating traffic court. *Id*. at 60.

The parties focus on the differences between Judge Cantrell's roles and those of the mayors in *Dugan* and *Ward*. Both sides can point to certain features that help them. The *Dugan* mayor was one of five officials making spending decisions, while Judge Cantrell has an even less influential 1/13 vote on decisions about the Judicial Expense Fund. But the *Dugan* mayor, despite his title, had no executive responsibilities. As a result, maintaining the financial health of the village provided only a "remote" benefit to Dugan. *Ward*, 409 U.S. at 61. In contrast, because the *Ward* mayor ran the town, he had a direct and personal interest in the finances of the civic institution. *Id*. at 60–61.

We conclude that Judge Cantrell is more like the *Ward* mayor than the *Dugan* mayor. Because he must manage his chambers to perform the judicial tasks the voters elected him to do, Judge Cantrell has a direct and personal interest in the fiscal health of the public institution that benefits from the fees his court generates and that he also helps allocate. And the bond fees impact the bottom line of the court to a similar degree that the fines did in *Ward*,

Case: 18-30954    Document: 00515152183    Page: 12    Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN    Document 159-2    Filed 10/24/19    Page 12 of 14

No. 18-30954

where they were 37–51% of the town's budget. *Ward*, 409 U.S. at 58. The 20–25% of the Expense Fund that comes from bond fees is a bit below that percentage but still sizeable enough that it makes a meaningful difference in the staffing and supplies judges receive. The dual role thus may make the magistrate "partisan to maintain the high level of contribution" from the bond fees. *Ward*, 409 U.S. at 60.

Our holding that this uncommon arrangement violates due process does not imperil more typical court fee systems. Our reasoning depends on the dual role combined with the "direct, personal, [and] substantial" interest the magistrate has in generating bond fees. *Tumey*, 273 U.S. at 523. To take one example, none of these features are present for fines in federal criminal cases. Judges do not have a say in how those funds are spent. The amount of the fines—which is supposed to take into account the costs of incarceration and thus, if anything, fund the Bureau of Prisons rather than the judiciary, U.S.S.G. § 5E1.2(d)(7)—are not set aside for judicial operations even on a national level, let alone for the handful of federal judges who sit on a local district court. The benefits are so diffuse that a single judge sees no noticeable impact on her chambers from the fines she imposes and thus feels no temptation from them.

The temptation facing the Orleans Parish magistrate is far greater. His dual role—the sole source of essential court funds and an appropriator of them—creates a direct, personal, and substantial interest in the outcome of decisions that would make the average judge vulnerable to the "temptation . . . not to hold the balance nice, clear, and true." *Tumey*, 273 U.S. at 532. The current arrangement pushes beyond what due process allows. *Cf. Cain*, 2019 WL 3982560, at *6 (holding that Orleans Parish judges' role in both imposing and administering court fees and fines violated due process).

Case: 18-30954 Document: 00515152183 Page: 13 Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN Document 159-2 Filed 10/24/19 Page 13 of 14

No. 18-30954

III.

After recognizing this due process violation, the district court issued the following declaration: "Judge Cantrell's institutional incentives create a substantial and unconstitutional conflict of interest when he determines [the class's] ability to pay bail and sets the amount of that bail."

That declaratory relief was all plaintiffs sought. They believed that section 1983 prevents them from seeking injunctive relief as an initial remedy in this action brought against a state court judge. *See* 42 U.S.C. § 1983 ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable . . . .").[7]

That statutory requirement reflects that declaratory relief is "a less harsh and abrasive remedy than the injunction." *Steffel v. Thompson*, 415 U.S. 452, 463 (1974) (quotation omitted); *see also Robinson v. Hunt Cty.*, 921 F.3d 440, 450 (5th Cir. 2019); RESTATEMENT (SECOND) OF JUDGMENTS § 33 cmt. c ("A declaratory action is intended to provide a remedy that is simpler and less harsh than coercive relief . . . ."). Principal among its advantages is giving state and local officials, like Judge Cantrell, the first crack at reforming their practices to conform to the Constitution. *Steffel*, 415 U.S. at 470.

One response to the declaratory judgment would be eliminating Judge Cantrell's dual role, a role that is not mandated by Louisiana law. In contrast, because Louisiana law does require that the bond fees be sent to the Judicial Expense Fund, LA. R.S. 13:1381.5(B)(2)(a), the declaratory judgment cannot undo that mandate. Challengers did not seek to enjoin that statute, instead arguing only that the dual role violated due process. But given today's ruling

---

[7] This provision is implicated only if the conflict claim challenges actions undertaken in Judge Cantrell's judicial capacity, as opposed to his administrative capacity. Because the plaintiffs sought only declaratory relief, we need not reach this question.

Case: 18-30954     Document: 00515152183     Page: 14     Date Filed: 10/09/2019
Case 2:17-cv-06197-EEF-MBN   Document 159-2   Filed 10/24/19   Page 14 of 14

No. 18-30954

and last week's in *Cain*, it may well turn out that the only way to eliminate the unconstitutional temptation is to sever the direct link between the money the criminal court generates and the Judicial Expense Fund that supports its operations.

\* \* \*

The judgment of the district court is AFFIRMED.